### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| CHARLES MCDONALD, Derivatively on Behalf of Nominal Defendant, RPM INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> vs. <br><br> JOHN P. ABIZAID, BRUCE A. CARBONARI, DAVID A. DABERKO, JENNIFFER D. DECKARD, SALVATORE D. FAZZOLARI, RUSSELL L. GORDON, THOMAS S. GROSS, EDWARD W. MOORE, CRAIG S. MORFORD, FREDERICK R. NANCE, CHARLES A. RATNER, FRANK C. SULLIVAN, THOMAS C. SULLIVAN, WILLIAM B. SUMMERS JR., JERRY SUE THORNTON, and JOSEPH P. VIVIANO, <br><br> Defendants, <br><br> and <br><br> RPM INTERNATIONAL, INC. <br><br> Nominal Defendant. | CASE NO.: 1:17-cv-907 <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **(JURY TRIAL DEMANDED)** |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Charles McDonald ("Plaintiff"), by and through his undersigned attorneys, submits this Verified Shareholder Derivative Complaint (the "Derivative Complaint") against defendants named herein. Plaintiff's information and belief is based upon, among other things, the investigation conducted by and under the supervision of his counsel which included, among other things: (a) a review and analysis of regulatory filings filed by RPM International, Inc. ("RPM" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated

1

by RPM; (c) a review of other publicly available information concerning RPM, including articles in the news media; (d) complaints and related materials in litigation commenced against some or all of the Individual Defendants and/or the Company, including, but not limited to, the disclosure and accounting fraud complaint filed by the SEC against RPM and Defendant Edward W. Moore ("Moore") on September 9, 2016 ("SEC Complaint");[1] and (e) applicable rules and regulations.

## SUMMARY OF THE ACTION

1.     This is a shareholder's derivative action brought for the benefit of Nominal Defendant RPM International, Inc. RPM is a Delaware corporation with its principal place of business located in Medina, Ohio. Its fiscal year runs from June 1 through May 31.[2] RPM has numerous subsidiaries through which it manufactures and sells various chemical product lines, including paints, protective coatings, roofing systems, sealants, and adhesives. This derivative action is brought against certain members of the Company's Board of Directors (the "Board") and certain of its executive officers (collectively referred to herein as the "Individual Defendants") seeking to remedy the Defendants' violations of state law and breaches of fiduciary duty during the period beginning August 2012 through the present (the "Relevant Period").

2.     The case arises out of a SEC investigation that has now turned into an enforcement action filed in September 2016 against RPM and its in-house General Counsel and Chief Compliance Officer, Defendant Edward W. Moore ("Moore").

---

[1] The SEC Complaint is docketed as *Securities and Exchange Commission v. RPM International, Inc. and Edward W. Moore,* Case No. 1:16-cv-01803 (D.D.C.). The SEC Complaint is attached hereto as Exhibit A.

[2] RPM's fiscal year runs from June 1, 20XX through May 31, 20XX and is divided into the following four quarterly periods: (i) First Quarter – June 1, 20XX to August 31, 20XX; (ii) Second Quarter – September 1, 20XX to November 30, 20XX; (iii) Third Quarter – December 1, 20XX to February 28, 20XX; and (iv) Fourth Quarter – March 1, 20XX to May 31, 20XX. For example, fiscal year 2017 is divided as follows: (i) First Quarter – June 1, 2016 to August 30, 2016; (ii) Second Quarter – September 1, 2016 to November 30, 2016; (iii) Third Quarter – December 1, 2016 to February 28, 2017; and (iv) Fourth Quarter – March 1, 2017 to May 31, 2017.

3.     The gravamen of the SEC Complaint is based on RPM's submission of materially false and misleading statements in its Form 10-Q's for the first three quarters of fiscal year 2013 and other filings with the SEC, as well as the Company's failure to disclose material weaknesses in RPM's internal controls over financial reporting and disclosure controls.  These allegations involve RPM's failure to timely disclose and accrue for a Department of Justice ("DOJ") investigation involving violations of the False Claims Act for a variety of reasons including overcharging the U.S. Government per the government's contractual agreements with the Company's subsidiary, Tremco Incorporated ("Tremco"). The DOJ investigation was prompted by a *qui tam* complaint filed on July 15, 2010.

4.     Defendant Moore learned of the DOJ investigation via a subpoena in March 2011 seeking Tremco documents concerning its U.S. Government contracts. By April 5, 2011, the Company's independent auditor, Ernst & Young LLP ("E&Y"), as well as Defendant Frank C. Sullivan ("F. Sullivan"), the Company's Chief Executive Officer, and RPM's Audit Committee had been informed about the DOJ investigation.  On August 9, 2012, Defendant Moore was provided a copy of the *qui tam* complaint by the DOJ.

5.     By August 31, 2012, the Company was on notice that the overcharges were north of $11 million based on a partial analysis performed by a RPM consultant in August 2012. Defendant Moore knew by September 12, 2012, that the analysis indicated that the overcharges were over $11 million. This information was conveyed to the DOJ on September 12, 2012. Based on the allegations in the SEC Complaint, Defendant Moore withheld this information from the Company's independent auditor, E&Y, the Company's senior management, and the Board.

6.     By December 21, 2012, Defendant Moore knew that the components of a proposed offer to settle the DOJ investigation and violations of the False Claims Act had grown

to $27-28 million. On January 10, 2013, RPM submitted a settlement offer to the DOJ for $28.3 million. Defendant F. Sullivan had been told about the proposed settlement offer the day before on January 9, 2013, but it was not until January 22, 2013, that Defendant Russell L. Gordon ("Gordon"), the Company's Chief Financial Officer, and the Board learned of the $28.3 million settlement offer.

7.      On March 29, 2013, the DOJ made a $71 million counterproposal that included a damages multiplier of 2.5, pursuant to the False Claims Act. Two days later on April 1, 2013, the Company filed its Form 10-Q for the third quarter ending February 28, 2013. The Form 10-Q revealed the DOJ investigation and an accrual for $68.8 million. This was the first public disclosure of the DOJ investigation and accompanying accrual.

8.      In August 2013, RPM formally settled the DOJ investigation and underlying *qui tam* complaint for $61 million, which was announced by the DOJ on August 28, 2013. It was not until April 5, 2014, when E&Y reviewed a chronology sent to the SEC on March 31, 2014, discussing RPM's communications with the DOJ, that E&Y learned that on December 9, 2012, RPM told the DOJ it would send a settlement proposal prior to January 11, 2013. Defendant Moore then misled E&Y about the DOJ investigation by telling them that: (i) the expected loss as of December 19, 2012 was $0 to $10 million (when, in fact, Defendant Moore knew at the latest by September 12, 2012, that the overcharges were already north of $11 million, not counting the FCA damages multiplier); (ii) the range of reasonably probable loss continued to be $0 to $10 million through January 8, 2013 (by this time Defendant Moore knew that the estimated overcharges had already mushroomed to $27-28 million); and (iii) the range of probable loss went up to $27-28 million between January 8, 2013 and January 11, 2013

9.      Defendant Moore knew that the range was $27-28 million by December 21, 2012, not including any multiplier pursuant to the FCA.

10.     On June 24, 2014, the SEC notified RPM that it was conducting a formal investigation into the timing of the disclosures concerning the DOJ investigation and recording of the accrual in connection with the underlying *qui tam* complaint. At the same time, while conducting the Company's fiscal year 2014 audit during the summer of 2014, E&Y learned additional facts about the DOJ investigation and accompanying accrual, including the overcharge estimates sent to the DOJ. As a result, on July 17, 2014, E&Y told RPM it refused to sign off on the fiscal year 2014 audit unless RPM conducted an independent investigation into these issues. The Board, through its Audit Committee, quickly cobbled together a two week investigation that was disclosed by the Company on July 28, 2014, in a Form 8-K filed that same day with the SEC. This disclosure was materially false and misleading as it made it appear that it was the SEC investigation that prompted the independent investigation and not E&Y's threat concerning signing off on the fiscal year 2014 audit. In fact, it was not until the filing of the SEC Complaint in September 2016 that the true reason for the independent investigation was publicly revealed for the first time. The Board was well aware of the true events surrounding the reasons for conducting the independent investigation and permitted the Company, with full knowledge of E&Y's threat, to file materially false and misleading statements with the SEC. This is the point where the Board's culpability begins.

11.     The fruits of the independent investigation were revealed to E&Y in a conference call on August 10, 2014. The independent investigation revealed that Defendant Moore knew by the end of the third week of December 2012 that RPM's exposure was going to increase from around $11 million to around $28 million, although there was no disclosure made by Defendant

Moore to the Audit Committee at its meeting on January 4, 2013, regarding any of the overcharge figures already known by Defendant Moore. Based on the independent investigation, the Board concluded that it was all just one big mistake on the part of Defendant Moore.

12.     As a result of the independent investigation, on August 11, 2014, the Audit Committee directed RPM to restate its financials for the first three quarters of fiscal year 2013. The restatement reflected an $11.4 million accrual for the first quarter of fiscal year 2013 (which corresponded with the $11.4 million estimate of the overcharges sent to the DOJ on October 1, 2012), and an additional $16.9 million accrual for the second quarter of fiscal year 2013 (for a total accrual of $28.3 million that corresponded with RPM's settlement offer made to the DOJ on January 11, 2013, and was the estimate of overcharges known by Defendant Moore by December 21, 2012). The third quarter of fiscal year 2013 was also restated to reduce the accrual in that quarter from $68.8 million to $40.5 million, because $28.3 million was accrued for in the first two quarters of fiscal year 2013 per the restatement.

13.     The Audit Committee's independent investigation also found that "there was no intentional misconduct on the part of any of … [the Company's] officers." The forensic accountants retained to conduct the investigation were Deloitte & Touche LLP ("Deloitte").

14.     On August 14, 2014, RPM filed a Form 8-K with the SEC announcing the restatement and that the restatement "reflects a material weakness in the Company's internal control over financial reporting and that its disclosure controls and procedures were not effective as of August 31, 2012 and November 30, 2012" as they did not operate to prevent material misstatements. That same day the Company filed with the SEC amended Forms 10-Q for the first, second and third quarters of fiscal year 2013 reflecting the restatement.

15.     It did not take long for the Board to retaliate against E&Y. On May 4, 2015, the Company filed a Form 8-K with the SEC announcing the dismissal of E&Y and that the audit for fiscal year 2015 would be E&Y's last audit for the Company. E&Y had been the Company's independent auditor since June 23, 2005, when the prior independent auditor declined to stand for re-election. The Company also announced that Deloitte, the forensic accountants who purportedly concluded there had been no intentional misconduct by any RPM officer, would be the Company's new auditor. This was a very lucrative account that generated approximately $5-7 million per annum in fees for the Company's independent auditor.

16.     The SEC investigation continued and on October 29, 2015, RPM disclosed that it and Defendant Moore had each received a Wells Notice, signifying that the SEC staff  had made a preliminary determination to bring an enforcement action against them. That enforcement action was filed on September 9, 2016. The Board's reaction to the SEC Complaint is telling. First, it maintained all along that the independent investigation concluded that there was no intentional misconduct on the part of any of the Company's officers. Second, that the SEC Complaint mischaracterized both the Company's and Defendant Moore's actions. Third, that RPM intended to contest the SEC Complaint "vigorously and is confident it will prevail at trial." Fourth, and directly attributable to the Board, the rather unusual statement that:

> The RPM Board of Directors has the utmost confidence in Mr. Moore's integrity and ability and believe he conducted himself in this matter professionally, honestly, and ethically, …

17.     As indicated by the Board's statements, the Board has already taken the position that Defendant Moore did not commit any intentional misconduct despite the overwhelming allegations in the SEC Complaint to the contrary.  In fact, the Board itself caused the Company to misrepresent the reasons for the independent investigation by failing to disclose that it was

E&Y's threat to not sign off on the fiscal year 2014 audit that prompted the independent investigation, which renders the Board culpable as well. Along with the conclusion by the Audit Committee that there was not any intentional misconduct by any of the Company's officers, it was all just one big mistake, and that the Company intended to "contest the allegations in the complaint vigorously and is confident it will prevail at trial," it is clear that the Board is predisposed to refuse any demand to take action against Defendant Moore (or any other members of senior management as well), and that the Board itself faces a substantial risk of liability for its own misleading statements regarding the reasons for the independent investigation. Thus, any demand made on this Board to take action will fall on deaf ears and is futile.

18.     The Individual Defendants breached their duties of loyalty, care and good faith by, amongst other things:  (i) failing to take appropriate remedial action when the Board knew, or should have known, of certain of Defendant Moore's misconduct; (ii) allowing the Company to file materially false and misleading statements with the SEC in violation of federal rules and regulations; (iii) failing to adhere to the Company's stated then applicable Code of Business Conduct and Ethics, and Role in Risk Oversight guidelines; and (iv) allowing the Company to fail to disclose pertinent, material, and important information in a timely manner.

19.     Defendant Moore is liable for concealing the material information concerning the DOJ investigation from the Board, the Company's independent auditor, E&Y, and RPM's senior management, which caused the Company to have to restate its financials for the first three quarters of fiscal year 2013 and subjected the Company to the SEC investigation and enforcement action.

20.     As a result of the Individual Defendants' breaches of fiduciary duty, the Company has already suffered damage and will continue to suffer damage. In fact, as early as July 27,

2015, the Company conceded that it has already "incurred significant legal and accounting expenditures in connection with the SEC investigation" and that the "investigation … could have an adverse impact on our reputation, business, financial condition, results of operation or cash flows." By January 6, 2016, the Company recorded an accrual recognizing that it was probable that the Company would suffer a loss. Plaintiff seeks to represent the Company and recover damages on behalf of the Company against the Individual Defendants, as well seeking equitable relief in the form of corporate governance intended to deter, detect, and mitigate against this type of misconduct in the future.

### JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  There is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

22.     This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contact with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding in violation of fiduciary duties owed to RPM occurred in this District and defendants have received substantial compensation in this

District by doing business here and engaging in numerous activities that have an effect in this District.

## PARTIES

24.     Plaintiff is currently a stockholder of RPM and has continuously been a stockholder of RPM since before the beginning of the Relevant Period. Plaintiff is a resident of Arizona.

25.     Nominal Defendant RPM is incorporated under the laws of the State of Delaware and maintains its principal executive offices in Medina, Ohio. RPM is a self-described world leader in specialty coatings, sealants, building materials and related services across three reportable segments: (a) industrial; (b) consumer; and (c) specialty. The Company's industrial products include roofing systems, sealants, corrosion control coatings, flooring coatings and other construction chemicals. The Company's consumer products are used by professionals and do-it-yourselfers for home maintenance and improvements and by hobbyists. RPM's specialty products include industrial cleaners, colorants, exterior finishes, specialty OEM coatings, edible coatings, restoration services equipment and specialty glazes for the pharmaceutical and food industries. The Company markets its products in approximately 164 countries and reported $4.8 billion in net sales for fiscal year 2016.

26.     Defendant John P. Abizaid ("Abizaid") has served as a Director since 2008 and has been a member of the Company's Compensation Committee throughout the Relevant Period. According to the Company's proxy statement filed on Schedule 14A with the SEC on August 24, 2016 ("the 2017 Proxy"), Abizaid retired from the U.S. Army in 2007 after 34 years of service and now serves as a Senior Partner with JPA Partners LLC, a Nevada-based strategic and analytic consulting firm. The 2017 Proxy also states that "the Board determined Abizaid should

serve as a Director because of the extensive leadership and management experience he gained during his distinguished military career in which he ultimately became a four-star general in the U.S. Army." Upon information and belief, Abizaid is a citizen of Nevada.

27.     Defendant Bruce A. Carbonari ("Carbonari") has served as a Director since 2002. Carbonari has served on the Company's Governance and Nominating Committee, and its Executive Committee. Carbonari also served on RPM's Audit Committee throughout the Relevant Period.  According to the 2017 Proxy, Carbonari is the retired Chairman and Chief Executive Officer of Fortune Brands, Inc. ("Fortune Brands") and served in those capacities from 2008 through his retirement in 2011. He served as Fortune Brands' President and Chief Executive Officer from 2007 to 2008 and held various positions with Fortune Brands and its affiliates and/or divisions since 1998. Previously, Carbonari served as President and Chief Executive Officer of Moen, Inc. ("Moen") from 1990 to 1998. Prior to joining Moen in 1990, Carbonari served as Executive Vice President and Chief Financial Officer of Stanadyne, Inc., after beginning his career with PricewaterhouseCoopers LLP. The 2017 Proxy also states that "the Board of Directors has determined that Mr. Carbonari should serve as a Director because of his extensive executive management experience, including his service as Chairman and Chief Executive Officer of Fortune Brands, Inc. In that position, Mr. Carbonari dealt with many of the major issues, such as financial, strategic, technology, compensation, management development, acquisitions, capital allocation, government and stockholder relations, that the Company deals with today."  Further, the Board stated that "with his extensive financial background, Mr. Carbonari is a financial expert for the Company's Audit Committee." The 2017 Proxy also states that Carbonari qualifies as an "audit committee financial expert as that term is defined in Item

407(d) of Regulation S-K and satisfies the NYSE accounting and financial management expertise requirements.  Upon information and belief, Carbonari is a citizen of Florida.

28.     Defendant David A. Daberko ("Daberko") has served as a Director since 2007. Daberko has been a member of the Company's Compensation Committee throughout the Relevant Period and a member of RPM's Executive Committee since June 2015. According to the 2017 Proxy, Daberko is the retired Chairman and Chief Executive Officer of National City Corporation ("National City"), which is now part of PNC Financial Services Group, Inc. Daberko served in those capacities from 1995 until his retirement in 2007. From 1993 until 1995, he served as President and Chief Operating Officer of National City. Daberko was elected Deputy Chairman of National City and President of its banking operations, National City Bank in Cleveland, in 1987, and initially joined National City Bank in 1968.  He is also a director of Marathon Petroleum Corporation and MPLX GP LLC, and is a former director of Williams Partners L.P. and former Chairman of Access Midstream Partners, L.P.  Daberko also was a director of OMNOVA Solutions Inc. According to RPM's proxy statement filed on Schedule 14A with the SEC on August 25, 2015 ("2016 Proxy"), Daberko is a trustee of Case Western Reserve University, University Hospitals of Cleveland and Hawken School. The 2017 Proxy states that the Board determined Daberko "should serve as a Director because of his extensive executive management experience, including 12 years as Chairman and Chief Executive Officer of National City Corporation." RPM further stated in the 2017 Proxy that Daberko has experience dealing with "many of the major issues, such as financial, strategic, technology, compensation, management development, acquisitions, capital allocation, government and stockholder relations, that the Company deals with today." Upon information and belief, Daberko is a citizen of Florida.

12

29.     Defendant Jenniffer D. Deckard ("Deckard") has served as a Director since October 8, 2015 and has been a member of the Company's Governance and Nominating Committee since joining the Board. According to the 2017 Proxy, Deckard has served as President, Chief Executive Officer and director of Fairmount Santrol Holdings Inc. ("Fairmount Santrol") since 2013, and previously served as Fairmount Santrol's President from January 2011 until May 2013, Vice President of Finance and Chief Financial Officer from 1999 until 2011, Corporate Controller from 1996 to 1999 and Accounting Manager from 1994 until 1996. She also serves on the boards of the Cleveland Foundation, the Edwins Foundation, and the First Tee of Cleveland. Deckard also serves on the Case Western Weatherford School of Management's Visiting Committee and a director of the Fairmount Santrol Foundation. The 2016 Proxy also states that Deckard served on the Chardon Healing Fund. The Company purchased products and services from Fairmount Santrol as follows: FY2016 - $1.8 million, and FY2015 - $1.5 million. The 2017 Proxy also stated that the Board determined that "Deckard should serve as a Director because of her extensive executive management experience and financial expertise."  Upon information and belief, Deckard is a citizen of Ohio.

30.     Defendant Salvatore D. Fazzolari ("Fazzolari") has served as a Director since January 22, 2013. Fazzolari has been a member of the Company's Audit Committee since he joined the Board and a member of RPM's Executive Committee since June 2015. According to the 2017 Proxy, Fazzolari served as Chairman, President and Chief Executive Officer of Harsco Corporation, a diversified global industrial company, from 2008 to February 2012, Previously, he served as President (2006 – 2007), Chief Financial Officer (1998 – 2007) and Treasurer and Corporate Controller at Harsco Corporation.  As set forth in the 2017 Proxy, Fazzolari is a certified  public  accountant  and  a  certified  information  systems  auditor,  although  both

certifications are inactive.  He also serves on the board of directors of OrangeHook, Inc., Gannett Fleming Affiliates, Inc. and Bollman Hat Company. Fazzolari is also on the advisory board of Current Capital, LLC, and is a trustee of Susquehanna University. The 2017 Proxy states that the Board determined Fazzolari "should serve as a Director because of his extensive executive management experience" and that "because of his considerable financial background, he is a financial expert for the Company's Audit Committee." The 2017 Proxy also states that Fazzolari qualifies as an "audit committee financial expert" as that term is defined in Item 407(d) of Regulation S-K and satisfies the NYSE accounting and financial management expertise requirements.   Upon information and belief, Fazzolari is a citizen of Pennsylvania.

31.     Defendant Russell L. Gordon ("Gordon") was appointed RPM's Vice President and Chief Financial Officer ("CFO") in April 2012 after serving as the Company's Vice President of Corporate Planning from 2007 to 2012. For fiscal years 2013-2016, Gordon received total compensation of $1,506,528 (2013), $1,885,991 (2014), $2,004,069 (2015), and $3,066,097 (2016).  According to RPM's 2016 Form 10-K,  prior to joining RPM, Gordon held various financial positions in corporate treasury and control, as well as in the Specialty Chemicals Division of Goodrich Corporation and was an industrial engineer at VLSI Technology Inc. Upon information and belief, Gordon is a citizen of Ohio.

32.     Defendant Thomas S. Gross ("Gross") has served as a Director of the Company since April 17, 2012. Gross has been a member of RPM's Audit Committee throughout the Relevant Period.  According to the 2017 Proxy, Gross served as Vice Chairman and Chief Operating Officer for the Electrical Sector of Eaton Corporation plc ("Eaton"), a global diversified power management company, from January 2009 until his retirement in August 2015. Gross joined Eaton in 2003 as Vice President, Eaton Business Systems, and from June 2004 to

December 2009 served as President of Eaton's power quality and controls business. Prior to joining Eaton, Gross held executive leadership positions with Danaher Corporation, Xycom Automation and Rockwell Automation. He is also a director of WABCO Holdings, Inc., a leading manufacturer of vehicle control systems. According to the 2016 Proxy, Gross served on the board of governors of the National Electrical Manufacturers Association. The Company purchased products and services from Eaton as follows: FY2012 - $600,000, FY2013 - $105,000, FY2014 - $140,000, FY2015 - $300,000, and FY2016 - $300,000. The 2017 Proxy also states that the Board determined Gross "should serve as a Director because of his extensive executive management experience at Eaton Corporation plc" and that "with his extensive financial background, Mr. Gross is a financial expert for the Company's Audit Committee." The Board also determined that Gross qualifies as an "audit committee financial expert" as that term is defined in Item 407(d) of Regulation S-K and satisfies the NYSE accounting and financial management expertise requirements.  Upon information and belief, Gross is a citizen of Nevada.

33.     Defendant Edward W. Moore ("Moore") was appointed Senior Vice President, General Counsel, Chief Compliance Officer and Secretary in 2013. According to RPM's 2016 Form 10-K, Moore served as RPM's Vice President, General Counsel and Secretary since 2007, adding the title of Chief Compliance Officer in 2011. Prior to joining RPM, Moore was with the law firm of Calfee, Halter & Griswold LLP ("Calfee") from 1982 to 2006. While at Calfee, Moore was an associate from 1982-1989 and a partner from 1990-2006. He was a member of the firm's Executive Committee, Chair of the Associates Committee and Co-Chair of the Securities and Markets Group. In fact, the Calfee law firm has served as corporate counsel to the Company for decades and currently serves as RPM's corporate counsel. For fiscal years 2013-2016, Moore received total compensation of $1,428,985 (2013), $1,763,803 (2014), $1,795,332 (2015), and

15

$3,704,278 (2016). Moore is a named defendant in the SEC Complaint. Upon information and belief, Moore is a resident of Ohio.

34.     Defendant Craig S. Morford ("Morford") has served as a Director of the Company since April 18, 2013, and has been a member of RPM's Governance and Nominating Committee since he joined the Board. According to the 2017 Proxy, Morford also serves as Chief Legal and Compliance Officer of Cardinal Health, Inc. ("Cardinal Health"). Morford joined Cardinal Health in 2008 as Chief Compliance Officer, and became Chief Legal and Compliance Officer in 2009. Prior to joining Cardinal Health, Morford spent 20 years with the U.S. Department of Justice.  He is a member of The Association of General Counsel and serves on the audit and compliance committees of the board of trustees of Ohio State University The 2017 Proxy states that the Board determined that Morford "should serve as a Director primarily due to his significant experience in legal affairs, regulatory compliance, corporate governance, corporate ethics and enterprise risk management at Cardinal Health and his service with the U.S. Department of Justice." Upon information and belief, Morford is a citizen of Ohio.

35.     Defendant Frederick R. Nance ("Nance") has served as a Director of the Company since 2007. Nance has been a member of RPM's Governance and Nominating Committee throughout the Relevant Period. According to the 2017 Proxy, Nance has served as Regional Managing Partner at the law firm of Squire Patton Boggs (US) LLP, Attorneys-at-law, Cleveland, Ohio, since 2007. Nance also serves on the boards of the Greater Cleveland Partnership, the Cleveland Clinic and Team NEO. According to the Company's proxy statement filed on Schedule 14A with the SEC on August 29, 2012 ("2013 Proxy"), Nance's law firm received $250,000 for providing legal services to RPM in fiscal 2012. The 2017 Proxy states that Nance's background "allows him to provide valuable insights to the Board of Directors,

particularly in regard to corporate governance and risk issues that confront the Company." Upon information and belief, Nance is a resident of Ohio.

36.     Defendant Charles A. Ratner ("Ratner") served as a Director of the Company from 2005 through his resignation effective on January 24, 2017.[3] Ratner was a member of RPM's Compensation Committee throughout the Relevant Period prior to his resignation. Ratner has served as Chairman of Forest City Realty Trust, Inc. ("Forest City") since 2011. Prior to becoming Chairman in 2011, he served as President and Chief Executive Officer of Forest City since 1993 and 1995, respectively. Ratner serves on the board of Forest City, United Way of Greater Cleveland, the Cleveland Foundation, and the United Jewish Communities. He also serves on the Board of Trustees for the Musical Arts Association, Mandel Associated Foundations, the Jewish Federation of Cleveland, and the David and Inez Myers Foundation. Ratner previously served as a director for American Greetings Corporation from 2001 to 2013. According to the 2017 Proxy, the "Board determined that Mr. Ratner should serve as a Director because of his extensive executive management experience, with a particular emphasis in real estate development, along with particular strengths with respect to leadership, management and corporate governance skills gained from more than 43 years of senior management experience at Forest City, as well as his experience on other boards of directors." Upon information and belief, Ratner is a resident of Ohio.

37.     Defendant Frank C. Sullivan ("F. Sullivan"), a director of RPM since 1995, has served as the Company's Chairman of the Board and Chief Executive Officer throughout the Relevant Period.   F. Sullivan joined RPM in 1987 and served as Regional Sales Manager from 1987 to 1989. In 1989, he became Director of Corporate Development, a Vice President in 1991,

---

[3] RPM Form 8-K filed with the SEC on January 24, 2017.

Chief Financial Officer in 1993, Executive Vice President in 1995, President in 1999, Chief Operating Officer in 2001, Chief Executive Officer in 2002, and was elected Chairman of the Board in 2008. He also serves on the boards of the Timken Company, the American Coatings Association, the Cleveland Rock and Roll Hall of Fame and Museum, Greater Cleveland Partnership, the Ohio Business Roundtable, the Army War College Foundation, Inc., the Chamber of Commerce of the United States, and the Medina County Bluecoats. F. Sullivan is the son of Defendant Thomas C. Sullivan, former Chairman Emeritus of the Company. For fiscal years 2013-2016, F, Sullivan received total compensation of $6,946,338 (2013), $7,359,162 (2014), $6,675,601 (2015), and $12,537,773 (2016). Upon information and belief, F. Sullivan is a resident of Ohio.

38.     Defendant Thomas C. Sullivan ("T. Sullivan") served as a Director of the Company from 1963 through 2016. T. Sullivan is the father of Defendant F. Sullivan. T. Sullivan retired on October 6, 2016, after 53 years of service on the Board. Pursuant to the 2016 Proxy, T. Sullivan served as Chairman Emeritus of the Board of Directors from October 2008 until his retirement. During his career with the Company that began in 1961, T. Sullivan served in a variety of key roles: Divisional Sales Manager 1961, Vice President 1967, Executive Vice President 1969, President 1970-76, Chief Executive Officer 1971-2002, Chairman of Board 1971-2008, and Chairman Emeritus 2008-2016. T. Sullivan was a director at Kaydon Corporation from 1998 until May 2010, and Agilysys, Inc. from 1984 until 2007. Throughout the Relevant Period and prior to his retirement, T. Sullivan also served on RPM's Executive Committee. Upon information and belief, T. Sullivan is a resident of New York.

39.     Defendant William B. Summers, Jr. ("Summers") has served as a Director of the Company since 2004. Throughout the Relevant Period, Summers has served on the Audit

18

Committee. According to the 2017 Proxy, Summers served as Chairman and Chief Executive Officer of McDonald Investments Inc. ("McDonald Investments"), an investment banking and securities firm and a part of Key Banc Capital Markets, until he retired in 2006.  Summers served as Chairman of McDonald Investments from 2000 to 2006, as its Chief Executive Officer from 1994 to 2000, and from 1998 until 2000 Summers served as Chairman of Key Capital Partners and an Executive Vice President.  Summers is a director of Integer Holdings Corporation (formerly Greatbatch, Inc.), and a member of the Advisory Board of Molded Fiber Glass Companies. Summers previously served as a director of Developers Diversified Realty Corporation. He is also a former member of the NASDAQ Stock Market board of directors. Summers serves as a trustee of Baldwin Wallace University, and serves on the boards of the Cleveland Rock and Roll Hall of Fame and Museum, the United States Army War College Foundation, and the Cleveland Convention and Visitors Bureau.  According to the 2017 Proxy, the Board determined   that "with his extensive financial background, Mr. Summers serves as a financial expert for the Company's Audit Committee." The Board also determined that Summers qualifies as an "audit committee financial expert" as that term is defined in Item 407(d) of Regulation S-K and satisfies the NYSE accounting and financial management expertise requirements. Upon information and belief, Summers is a resident of Wisconsin.

40.     Defendant Jerry Sue Thornton ("Thornton") has served as a Director of the Company since 1999 and has been a member of RPM's Compensation Committee throughout the Relevant Period. Thornton is the retired President of Cuyahoga Community College. She was President from 1992 to 2013. Prior to her employment with Cuyahoga Community College, Thornton served as President of Lakewood Community College in Minnesota. Thornton is a director of Applied Industrial Technologies, Inc., Barnes & Noble Education, Inc., and

FirstEnergy Corp. She is also a board member of United Way of Greater Cleveland, Greater Cleveland Partnership, the Rock and Roll Hall of Fame and Museum – Cleveland and New York, University Hospitals of Cleveland, the Cleveland Museum of Art, and Playhouse Square Foundation. From 2004 until 2011, Thornton was a director of American Family Insurance, and from 2001 until 2008, she was a director of National City Corporation. Thornton also previously served as a director for American Greetings Corporation from 2000 to 2013.   Upon information and belief, Thornton is a resident of Ohio.

41.    Defendant Joseph P. Viviano ("Viviano") served as a Director of the Company from 2001 through his resignation on October 8, 2015.  Prior to his resignation, Viviano was a member of RPM's Governance and Nominating Committee. According to the Company's proxy statement filed on Schedule 14A with the SEC on August 26, 2014 ("2015 Proxy"), Viviano is the retired Vice Chairman of Hershey Foods. He was Vice Chairman from 1999 to 2000 and its President from 1994 to 1999. From 2004 until 2009, Viviano was a director of Reynolds American Inc. (successor corporation to R.J. Reynolds Tobacco Company, where he served as a director from 2000 until 2004), from 1999 until 2008, Viviano was a director of Harsco Corporation, and from 1988 until 2008, he was a director of Chesapeake Corporation (now Canal Corporation).  The Company stated in its 2015 Proxy that Viviano has experience dealing with "many of the major issues, such as financial, strategic, technology, compensation, management development, acquisitions, capital allocation, government and stockholder relations, that the Company deals with today."  Upon information and belief, Viviano is a resident of Florida.

42.    Defendants Carbonari, Fazzolari, Gross, and Summers are sometimes collectively referred to herein as the "Audit Committee Defendants."

43.     Defendants Abizaid, Carbonari, Daberko, Deckard, Fazzolari, Gross, Morford, Nance, F. Sullivan, Summers, and Thornton are sometimes collectively referred to herein as the "Current Director Defendants."

44.     Defendants Abizaid, Carbonari, Daberko, Deckard, Fazzolari, Gordon, Gross, Moore, Morford, Nance, Ratner, F. Sullivan, T. Sullivan, Summers, Thornton and Viviano are sometimes collectively referred to herein as the "Individual Defendants."

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

45.     By reason of their positions as officers, directors and/or fiduciaries of RPM during the Relevant Period and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed RPM and its shareholders fiduciary obligations of good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of RPM and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

46.     Each director and officer of the Company owes to RPM and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

47.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of RPM, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Due to their positions with RPM, each of

the  Individual  Defendants  had  knowledge  of  material  non-public  information  regarding  the

Company.

48.     To discharge their duties, the Individual Defendants were required to exercise

reasonable and prudent supervision over the management, policies, practices and controls of the

Company.  By virtue of such duties, the officers and directors of RPM were required to, among

other things:

a.     Exercise  good  faith  to  ensure  that  the  affairs  of  the  Company  were

conducted in an efficient, business-like manner so as to make it possible to provide the highest

quality performance of their business;

b.     Exercise good faith to ensure that the Company was operated in a diligent,

honest and  prudent manner  and complied  with all applicable  federal, state and foreign laws,

rules,  regulations  and  requirements,  and  all  contractual  obligations,  including  acting  only

within the  scope of its legal authority; and

c.     Exercise  good  faith  in  supervising  the  preparation,  filing  and/or

dissemination of financial statements, press releases, audits, reports or other information required

by law, and in examining and evaluating any reports or examinations, audits, or other financial

information concerning the financial condition of the Company.

49.     From the start of the Relevant Period through April 2014, RPM maintained a

Code  of  Business  Conduct  and  Ethics  ("Code")  which  applied  to  the  Company's  directors,

officers and employees. The Code's stated purpose was to:

- Promote the honest and ethical conduct, including fair dealing
  and  the  ethical  handling  of  actual  or  apparent  conflicts  of
  interest;

22

- Promote full, fair accurate, timely and understandable disclosure of financial and other information to the SEC and in other public communications made by the Company;

- Promote compliance with all applicable laws and governmental rules and regulations;

- Promote the appropriate use and treatment of tangible and intangible property of the Company, including its trade secrets and proprietary information, and the protection of the Company's legitimate business interests, including corporate opportunities and confidential information;

- Promote the prompt reporting of actual or suspected violations of this Code, or other illegal or unethical behavior and outline reporting mechanisms;

- promote adherence to and compliance with all other applicable policies and procedures;

- Maintain a culture of compliance and ethical practices and reinforce the Company's commitment to integrity; and

- Deter wrongdoing.

50.    The Code stated in relevant part:

### *Integrity of Business and Accounting Records and Disclosure*

All the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. No records or information will be manipulated for the purpose of altering or distorting business results, and no deliberately false or inaccurate entries will be made for any purpose. All directors, officers and employees are required to cooperate with the Company's internal and independent auditors, and no director, officer or employee may take any action to coerce, manipulate, mislead or fraudulently influence any such auditors.

Each director, officer or employee involved in the Company's disclosure process, including, but not limited to the Chief Executive Officer, the Chief Financial Officer, principal accounting officer, controller or persons performing similar

23

functions (the "Senior Financial Officers"), is required to be familiar with and comply with the Company's disclosure controls and procedures and internal controls over financial reporting, to the extent relevant to his or her area of responsibility, so that the Company's public reports and documents filed with, or submitted to, the SEC comply in all material respects with the applicable federal securities laws and SEC rules.

In addition, each such person having direct or supervisory authority regarding any SEC filings, submissions or the Company's other public communications concerning its general business, results, financial condition and prospects should, to the extent appropriate within his or her area of responsibility, consult with other Company officers and employees and take other appropriate steps regarding these disclosures with the goal of making full, fair, accurate, timely and understandable disclosure.

The Company's Senior Financial Officers must:

• Act in an ethical manner with honesty and integrity;

• Ethically handle all actual or apparent conflicts of interest between personal and professional relationships;

• Promote full, fair, accurate, timely, and understandable disclosure in all reports and documents that the Company files with, or submits to, the SEC and other public filings or communications made by the Company;

• Promote compliance with all applicable laws, rules and regulations of federal, state and local governments, and all applicable private and public regulatory agencies;

• Not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations; and

• Promptly report to the Audit Committee any violation or suspected violation of the Code in accordance with the rules and procedures set forth in the present Code and in particular under the RPM Reportable Events Policy.

24

51.     According to the Company's 2015 Proxy, in April 2014 Company created a new code of business conduct and ethics entitled the "The Values and Expectations of 168."  The "Values and Expectations of 168" provides the following in relevant part:

> **Integrity:** Be open and honest. Accurately and openly disclose information in business transactions. Deception and retaliation have no place at RPM and will not be tolerated.
>
> **Commitment:** Follow the law, our policies and procedures. Safeguard our companies' property, assets and interests, and ensure the focus is on the collective goals of shareholders, employees, customers, consumers and communities. Responsible entrepreneurship: Search for innovative ways to compete and win in the markets we serve. Compete vigorously, but always do so fairly and in adherence to free enterprise and competition standards, environmental and human rights principles, and with respect for our customers, competitors and the communities in which we operate.
>
> **Moral courage:** Do the right thing, even when it is tough, and regardless of whether someone is watching or if you will receive credit.
>
> The Value of 168 and its core principles are the cornerstone for ALL decision making. We are RPM, and our success depends on each of us making good choices.
>
> ***
>
> No matter how strong any outside or business pressures may be, never deviate from the Value of 168 and its principles. Any employee who violates our values and expectations, or who directs or who knowingly permits an employee or representative to violate our values and expectations will be subject to disciplinary action up to and including termination.
>
> ***
>
> **Act In The Best Interest of the Company**
> You are expected to act for the company's benefit and to be free from conflicting interests when representing the company in business dealings or when making recommendations that may influence the company's actions. In some instances, your financial, professional and personal relationships and goals may come into

25

conflict with your commitment to the company. If that happens, you are required to disclose the conflict.

Anyone with direct or supervisory authority regarding SEC filings, submissions or other public communications concerning the general business, results, financial condition or prospects of RPM or any of its operating companies should, when appropriate, consult with other officers and employees who have subject-matter expertise in these areas and take appropriate steps regarding these disclosures. The goal is full, fair, accurate, timely and understandable disclosure. Any issues or concerns regarding accounting, internal accounting controls, or auditing matters, or any material violation of any securities laws, must be reported in accordance with the reporting procedures described [in] this guidebook.

***

**Employees, including Senior Financial Officers, must:**

• Act ethically and with honesty and integrity.

• Appropriately handle actual or apparent conflicts of interest between personal and professional relationships.

• Promote full, fair, accurate, timely and understandable disclosure in all reports and documents that the company communicates to or files publicly with any government agency.

• Promote compliance with applicable laws, rules and regulations of federal**,** state and local governments, and applicable private and public regulatory agencies.

• Not knowingly misrepresent, or cause others to misrepresent, facts about the company, including to the company's independent auditors, governmental regulators and self-regulatory organizations.

• Promptly report to RPM's Chief Compliance Officer or the Audit Committee Chair violations or suspected violations in accordance with the rules and procedures set forth in this guidebook or under the RPM Reportable Events Policy.

***

**Applicability of these Values and Expectations**

26

All employees, officers and directors of RPM, its operating companies and its subsidiaries must comply with the values and expectations identified in this guidebook. All officers and directors of RPM and its operating companies and subsidiaries must also comply with RPM's Management Policies.

\*\*\*

**Interpretations, waiver**
RPM International Inc.'s Board of Directors Governance and Nominating Committee is responsible for the interpretation and application of the Values & Expectations of 168 and approves this guidebook as RPM's Code of Business Conduct and Ethics and, subject to review, implementation guidelines, and approvals as required by relevant local laws, it is applicable to all employees and to its Senior Financial Officers. From time to time, the company may waive certain provisions. Any waiver of these provisions for directors, executive officers or Senior Financial Officers of the company may be made only by the Board of Directors or the Governance and Nominating Committee and must be promptly disclosed as required by SEC or New York Stock Exchange rules.

52.    With respect to the Audit Committee's "Role in Risk Oversight", the Company's

2013-2017 Proxy Statements  provide the following, in relevant part:

The Board of Directors believes that full and open communication between management and the Board of Directors is essential for effective risk management and oversight. Senior management, which includes the Chief Compliance Officer, attends quarterly meetings of the Board of Directors, as well as certain committee meetings, in order to address any questions or concerns raised by the Board of Directors on risk management and any other matters. …

The Board Committees assist the Board of Directors in fulfilling its oversight responsibilities in certain areas of risk. The Audit Committee assists the Board of Directors in fulfilling its oversight responsibilities with respect to risk management in the areas of financial reporting, internal controls, and compliance with legal and regulatory requirements. Risk assessment reports are regularly provided by management and the Company's internal auditors to the Audit Committee. …

All of these Board Committees report back to the full Board of Directors at meetings of the Board of Directors as to the Board

> Committees' activities and matters discussed and review at the
> Board Committees' meetings. …

53.     The Audit Committee is governed by the Audit Committee Charter (as amended

and restated on October 4, 2012, herein referred to as the "2012 Audit Committee Charter"). The

present Audit Committee Charter (as amended and restated July 26, 2016) is identical in relevant

part to the 2012 Audit Committee Charter (collectively referred to as the "Audit Committee

Charters"). The Audit Committee Charters provide that the Audit Committee serves the

following purpose, in relevant part:

> **MISSION AND PURPOSE**
>
> The Audit Committee (the "Committee") of RPM International
> Inc. (the "Company") is appointed by the Board of Directors of the
> Company (the "Board"). The members of the Committee serve at
> the pleasure of the Board. The primary function of the Committee
> is to (i) assist the Board in fulfilling its oversight of the integrity of
> the Company's financial statements, the Company's compliance
> with legal and regulatory requirements, the independent auditor's
> qualifications and independence, and the performance of the
> Company's internal audit function and independent auditor; and
> (ii) prepare the report of the Committee required to be included in
> the Company's proxy statement for the Annual Meeting of
> Stockholders.

54.     The Audit Committee Charters detail the following responsibilities and duties of

the Audit Committee, in relevant part:

> The Committee shall perform the following responsibilities and
> duties:
>
> *General Responsibilities:*
>
> • Meet periodically with internal auditors, the independent
>   auditor, and management in separate executive sessions to
>   discuss matters that should be discussed privately with the
>   Committee.

- Ensure that management has the proper review system in place to ensure that the Company's financial statements, reports and other financial information satisfy legal requirements.

- Prepare the report of the Committee in accordance with regulations of the SEC, to be set forth in the proxy statement for the Company's Annual Meeting of Stockholders.

- Disclose in the Company's proxy statement that this Charter is available on the Company's website, and provide the website address.

***

*Responsibilities with Respect to the Independent Auditor and Management*:

- Review, discuss and evaluate the following with management and the independent auditor, at least annually:

   (a)  Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies;

   (b)  Any analysis prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analysis of the effects of alternative Generally Accepted Accounting Principle ("GAAP") methods on the financial statements; and

   (c)  The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

- Discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures. However, the entire Board shall have overall responsibility for oversight of all of the Company's risk assessment and risk management policies.

***

*Responsibilities with Respect to the Internal Auditor*:

- The Committee will review and approve the nature and scope of the Company's internal audit program and the results of internal audits, including the adequacy of the Company's internal audit charter, plan, policies and internal controls and any significant findings and recommendations reported by the internal auditors (together with management's response).

- Review with the independent auditor and management, including the internal auditors (as appropriate), the responsibilities, structure, staffing and budget of the Company's internal audit function […].

*** 

*Responsibilities Related to Financial Statements and Disclosure Matters:*

- Discuss with management, internal audit and the independent auditor the Company's annual financial statements and related notes, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board whether the financial statements should be included in the Company's Annual Report on Form 10-K.

- Discuss with management, internal audit and the independent auditor the Company's quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the results of the independent auditor's review of the quarterly financial statements, before the filing of the Company's Quarterly Report on Form 10-Q.

- Review disclosures regarding internal controls and other matters made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q. In this regard, the Committee should specifically review and discuss, prior to public dissemination, management's annual report on internal control over financial reporting required pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 and related SEC rules.

- Review and discuss with management the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies (including the use of "proforma" or "adjusted" "non-GAAP financial information" contained in any such release or guidance). Such discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made). The Chair of the Committee may represent the entire Committee for these purposes and shall report any such matters to the Committee at its next meeting.

- Review policies and procedures with respect to officers' expense accounts, including their use of corporate assets, and consider the results of any review of these areas by the internal auditor or the independent auditor.

- Review and discuss reports from the independent auditor on:

(a)  All critical accounting policies and practices used;

(b) All alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and

(c) Other material written communications between the independent auditor and management including, but not limited to, any management letter, or schedule of unadjusted differences.

***

*Responsibilities Related to Compliance Oversight*:

- Establish procedures for the receipt, retention and treatment of complaints received by the Company (including, but not limited to, reports that may be prepared and submitted by the Chief Compliance Officer) regarding accounting, internal accounting controls, or auditing matters, and the confidential, anonymous submission by employees of concerns regarding accounting or auditing matters. The Committee shall receive, on a quarterly basis, a written report of all items reported through such procedures.

31

- Obtain from the independent auditor assurance that, if the independent auditor detects or becomes aware of any illegal act, the Committee is adequately informed, and that a report has been provided to the Committee if the independent auditor has reached specific conclusions with respect to such illegal acts.

- Advise the Board with respect to the Company's compliance with applicable laws and regulations. Discuss with management, including the General Counsel, legal compliance matters as well as other legal matters that may have a material impact on the Company's financial statements. The Committee is also to receive from management any reports submitted by legal counsel to the Company of evidence of a material violation of securities laws or breaches of fiduciary duties or similar violations.

- Receive copies of and discuss with management, including the General Counsel, and the independent auditor any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies or which could have a material impact on the Company's financial condition.

- Receive copies of all material correspondence with the SEC.

- Conduct or authorize such additional reviews, assessments or investigations as may be delegated to it by the Board, or on its own motion, as the Committee may deem necessary or appropriate to perform any of the foregoing functions.

55.     According to the Company's 2017 Proxy, all of the Audit Committee Defendants qualify as an "audit committee financial expert" as that term is defined in Item 407(d) of Regulation S-K, which provides, in pertinent part:

> (5) Audit committee financial expert. …
>
>> (ii) For purposes of this Item, an *audit committee financial expert* means a person who has the following attributes:
>>
>>> (A) An understanding of generally accepted accounting principles and financial statements;

(B) The ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves;

(C) Experience preparing, auditing, analyzing or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the registrant's financial statements, or experience actively supervising one or more persons engaged in such activities;

(D) An understanding of internal control over financial reporting; and

(E) An understanding of audit committee functions.

(iii) A person shall have acquired such attributes through:

(A) Education and experience as a principal financial officer, principal accounting officer, controller, public accountant or auditor or experience in one or more positions that involve the performance of similar functions;

(B) Experience actively supervising a principal financial officer, principal accounting officer, controller, public accountant, auditor or person performing similar functions;

(C) Experience overseeing or assessing the performance of companies or public accountants with respect to the preparation, auditing or evaluation of financial statements; or

(D) Other relevant experience.

56.    The Company's 2017 Proxy also stated that all of the Audit Committee Defendants satisfy the NYSE accounting and financial management expertise requirements. The New York Stock Exchange Listed Company Manual states the following, in relevant part:

## 303A.07 Audit Committee Additional Requirements

The audit committee must have a minimum of three members. All audit committee members must satisfy the requirements for independence set out in Section 303A.02 and, in the absence of an applicable exemption, Rule 10A-3(b)(1).

Commentary: Each member of the audit committee must be financially literate, as such qualification is interpreted by the listed company's board in its business judgment, or must become financially literate within a reasonable period of time after his or her appointment to the audit committee. In addition, at least one member of the audit committee must have accounting or related financial management expertise, as the listed company's board interprets such qualification in its business judgment. While the Exchange does not require that a listed company's audit committee include a person who satisfies the definition of audit committee financial expert set out in Item 407(d)(5)(ii) of Regulation S-K, a board may presume that such a person has accounting or related financial management expertise.

57.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the fiduciary duty of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of RPM, the absence of good faith on their part and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

58.     The Individual Defendants breached their duties of loyalty, care and good faith by: (i) failing to take appropriate remedial action when the Board knew, or should have known, of certain of Defendant Moore's misconduct;  (ii) allowing the Company to file materially false and misleading periodic reports and other filings with the SEC in violation of federal rules and

regulations; (iii) failing to adhere to the Company's applicable Code of Business Conduct and Ethics, and Role in Risk Oversight guidelines; and (iv) allowing the Company to fail to disclose pertinent, material, and important information in a timely manner.

## SUBSTANTIVE ALLEGATIONS

### Background

59.     RPM is a Delaware corporation with its corporate headquarters located in Medina, Ohio. According to its SEC filings, RPM's subsidiaries manufacture, market and sell various specialty chemical product lines, including high-quality specialty paints, protective coatings, roofing systems, sealants and adhesives, focusing on the maintenance and improvement needs of the industrial, specialty and consumer markets. The Company had $4.8 billion in net sales for fiscal year 2016.

60.     The Company is divided into three reportable segments; (i) industrial; (ii) specialty; and (iii) consumer. The industrial segment accounted for 51% of the Company's total net sales for fiscal year 2016.  Tremco is a wholly-owned subsidiary of the Company in RPM's industrial segment and, as described by the Company, includes Tremco Group, which encompasses the following major product lines: (a) waterproofing, coatings and institutional roofing systems used in building protection, maintenance and weatherproofing applications: (b) sealants, air barriers, tapes and foams that seal and insulate joints in various construction assemblies and glazing assemblies; (c) new residential home weatherization systems; and (d) specialized roofing and building maintenance and related services.

### RPM'S Misconduct Subjects the Company to the FCA Complaint and DOJ Investigation

61.     The False Claims Act ("FCA") generally provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim to the U.S. Government for

payment or approval and/or knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim … is liable to the U.S. Government for a civil penalty of not less than $5,000 and not more than $10,000 (as adjusted by the Federal Civil Penalties Inflation Act of 1990, 28 U.S.C. § 2461) for each such violation, plus three times the amount of the damages which the U.S. Government sustains because of the act. *See* 39 U.S.C. §§ 3729, et seq. Liability attaches both to the acts of knowingly seeking unwarranted payment from the U.S. Government and knowingly creating or causing to be created false statements or records to conceal, avoid or decrease an obligation. *Id.*

62.     The *qui tam* provisions of the FCA allow a plaintiff, known as a "relator," to bring an action in federal court in the name of the government. *See* 31 U.S.C. § 3730(b). When a relator files a complaint under the FCA, the complaint is filed under seal and provided to the DOJ so that the DOJ may investigate the relator's allegations. *Id.*

63.     On July 15, 2010, a former employee of Tremco, Gregory Rudolph,  filed an action under seal in the United States District Court for the District of Columbia captioned *United States, et al., ex rel. Gregory Rudolph v. Tremco Incorporated and RPM International, Inc.,* Civil Action No.10-1192 (D.D.C.), pursuant to the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b),  alleging that Tremco overcharged the U.S. Government under certain government contracts by failing to provide required price discounts from 2002 through 2008 (the "FCA Complaint").

64.     The FCA Complaint alleged that RPM and Tremco "knowingly violated the [FCA] by the following acts, *inter alia*:

> a. Failing to provide the [U.S.] Government with price discounts provided to private and other non-federal government customers, thereby depriving the [U.S.] Government of the most favorable pricing;

b. Marketing expensive materials to [U.S.] Government purchasers without disclosing the availability of lower-cost, identical materials also manufactured and sold by Defendant Tremco;

c. Installing or causing to be installed roofing products and systems with known defects on [U.S.] Government buildings;

d. Over-specifying roofing materials for [U.S.] Government jobs beyond what is required to fulfill the [U.S.] Government purchasers' objectives, resulting in substantial overcharges for roofing materials;

e. Unnecessarily utilizing Tremco's subsidiary as a general contractor and partnering with certain subcontractors in order to inflate costs and lock-out competition; and

f. Selling defective roofing products, materials, and systems to the [U.S.] Government directly and, indirectly, through roofing contractors."

65.  In March 2011, RPM learned of the DOJ investigation when Tremco received a subpoena from the U.S. Government, requesting documents concerning Tremco's U.S. Government contracts.[4] After learning of the DOJ investigation, in March 2011, RPM retained a law firm ("RPM's Counsel") to represent the Company in connection with the DOJ investigation.[5]  As of March 2011, Defendant Moore and RPM's Counsel knew that in order to settle an FCA matter, the DOJ generally required at least two times the amount of actual damages sustained from the false claims.[6]

66.  On April 5, 2011, E&Y and RPM's CEO, Defendant F. Sullivan, first learned of the DOJ investigation from Defendant Moore at an Audit Committee meeting.[7]  Once E&Y became

---

[4] SEC Complaint, ¶ 18.

[5] SEC Complaint, ¶ 21.

[6] SEC Complaint, ¶ 21.

[7] SEC Complaint, ¶ 22.

aware of the DOJ investigation in April 2011, its auditors asked Moore on at least a quarterly basis whether any new developments had occurred in the DOJ investigation.[8]

**Disclosure and Accrual Provisions Relating to the DOJ Investigation**

67.  Once RPM became aware of the DOJ investigation, the Company was required to comply with certain disclosure and accrual provisions of the federal securities laws with respect to the investigation. For example, Regulation S-X requires that financial statements included with an issuer's SEC filings comply with Generally Accepted Accounting Principles ("GAAP"), and provides that financial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading. *See* 178 C.F.R. § 210.4.01. Accounting standards Codification ("ASC") 450-20 codifies GAAP regarding "loss contingencies."[9]

68.  A loss contingency is an existing condition, situation, or set of circumstances involving uncertainty as to a possible loss that will be resolved when one or more future events occurs or fails to occur. *See* ASC 450-20-20. Loss contingencies include, among other things, (i) actual or possible claims; and (ii) pending or threatened litigation. *See* ASC 450-20-50-10. Under GAAP, an issuer must disclose a loss contingency if a material loss is reasonably possible, *see* ASC 450-20-50-3, and an issuer must record an accrual for a loss contingency, as a charge against income, if a material loss is probable and reasonably estimable, *see* 450-20-25-2.

69.  Additionally, under Item 303 of Regulation S-K ("Item 303"), which addresses Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") for Forms 10-K and 10-Q, an issuer must describe any known trends or uncertainties

---

[8] SEC Complaint, ¶ 22.

[9] The ASC became effective in 2009. Prior to the ASC, GAAP regarding loss contingencies was set forth in the Statement of Financial Standards No. 5, which was often referred to as "FAS 5."

that have had, or that the issuer reasonably expects will have, a material unfavorable impact on net sales, revenues, or income from continuing operations. *See* 17 C.F.R. § 229.303.

70.   Further, under Exchange Act Rule 12b-20, along with the information expressly required to be included in an SEC filing, an issuer must also disclose such further material information as may be necessary to make the required statements, in light of the circumstances, not misleading. *See* 17 C.F.R. § 240.12b-20.

## E&Y Suggests that RPM Consider Disclosing the DOJ Investigation, But RPM and Moore Decide Not to Disclose

71.   As early as June 7, 2012, E&Y sent an email to Defendant Moore suggesting that RPM consider disclosing the DOJ investigation, by providing Defendant Moore with sample disclosure language relating to government investigations.[10] The email stated in part: "As we head into year-end and start thinking about disclosures, etc. I wanted to pass along the attached, which is a document with an example disclosure related to … government investigations."[11] Despite being provided with sample disclosure language by E&Y in June 2012, Moore and RPM failed to publicly disclose the investigation at that point in time.[12]

72.   On August 9, 2012, the DOJ provided a copy of the FCA Complaint to RPM.[13]  A small group of RPM personnel, including Defendant Moore, reviewed the FCA Complaint. Defendant Moore failed to disclose the FCA Complaint to E&Y in August 2012.[14] In addition to the allegations set forth above in ¶¶ 64(a)-(f), with regard to the price discounting issue, the FCA

---

[10] SEC Complaint, ¶ 26.

[11] SEC Complaint, ¶ 26.

[12] SEC Complaint, ¶ 27.

[13] SEC Complaint, ¶ 28.

[14] SEC Complaint, ¶ 28.

Complaint also alleged that: (i) Tremco did not have sufficient policies in place concerning pricing and, thus, had no way to ensure or even know that the U.S. Government was getting the proper discount relative to commercial customers;[15] (ii) Tremco failed to have anyone who reviewed its sales documents and practices to ensure that the U.S. Government received the most favorable pricing; (iii) where Tremco failed to provide the U.S. Government received the most favorable pricing, that the non-complying discounts provided to non-government purchasers were reported to the U.S. Government or the discount provided to U.S. Government purchasers;[16] and (iv) Tremco's pricing structure, or lack thereof, resulted in Tremco routinely providing discounts to private customers without notifying the U.S. Government of these lower prices or providing U.S. Government customers with the same discounts.[17]

73.  On September 12, 2012, with Defendant Moore's knowledge and authorization, RPM's Counsel met with DOJ to discuss the DOJ investigation and informed the DOJ that Tremco had not complied with the pricing terms of its government contracts, resulting in overcharges by Tremco of at least $11 million during part of the time period under investigation, based on an analysis prepared by a consultant for RPM and Tremco.[18] Shortly after the meeting with the DOJ was concluded, RPM's Counsel told Defendant Moore what transpired during the meeting, including a discussion involving the $11 million overcharge analysis.[19]

---

[15] FCA Complaint, ¶ 31.

[16] FCA Complaint, ¶ 44.

[17] FCA Complaint, ¶ 47.

[18] SEC Complaint, ¶ 30.

[19] SEC Complaint, ¶ 30.

74.   On or about September 28, 2012, E&Y requested a status update from Defendant Moore regarding the DOJ investigation in connection with E&Y's fiscal year 2013 first quarter review of RPM for the period ended August 31, 2012.[20]  In response, Defendant Moore falsely told E&Y that "no claim has been asserted," and the matter was "investigative in nature and not in litigation."[21] Defendant Moore knew by this time of the FCA Complaint and that the $11 million overcharge analysis had been discussed with the DOJ by RPM's Counsel.[22]

75.   On October 1, 2012, in connection with E&Y's fiscal year 2013 first quarter review of RPM, Defendant Moore sent a management representation letter to E&Y stating that "since June 1, 2012, neither I, nor any of the lawyers over whom I exercise general legal supervision, have given substantive attention to or represented the company in connection with, material loss contingencies" exceeding $1.2 million.[23] Defendant Moore knew this to be false given that Defendant Moore and RPM's Counsel represented RPM in connection with the DOJ investigation, and that the potential loss was at least $11 million.[24]

76.   Later that day, during the evening hours of October 1, 2012, with Defendant Moore's knowledge and authorization, RPM's Counsel sent the DOJ a written analysis estimating that Tremco overcharged the U.S. Government by $11.4 million during part of the time period under investigation.[25]   That analysis failed to include any damage multiplier

---

[20] SEC Complaint, ¶ 31.

[21] SEC Complaint, ¶ 31

[22] SEC Complaint, ¶ 31.

[23] SEC Complaint, ¶ 32.

[24] SEC Complaint, ¶ 32.

[25] SEC Complaint, ¶ 33.

available under the FCA and related only to part of the time period under DOJ investigation, and to only one of the U.S. Government contracts at issue in the DOJ investigation.[26] Accordingly, Defendant Moore knew or should have known by this point that the amount Tremco overcharged the U.S. Government was likely more than $11.4 million.[27]

77.   The Audit Committee held its quarterly meeting the next morning on October 2, 2012, which was attended by, among others, the CEO, Defendant F. Sullivan, the CFO, Defendant Gordon, representatives from E&Y, and Defendant Moore.[28]   At that meeting, Defendant Moore failed to disclose the $11.4 million minimum overcharge estimate that RPM's analysis indicated and that the $11.4 written analysis had been submitted to the DOJ the evening prior.[29]

78.   As of the October 2, 2012 Audit Committee meeting, RPM had not yet filed its quarterly results for the first quarter ending August 31, 2012.[30] Notwithstanding the effect of any possible multiplier under the FCA, the $11.4 million estimated overcharge was in itself material given that it equaled almost 30% of the $33.9 million of net income reported by RPM for the first quarter of fiscal year 2013.[31]

---

[26] SEC Complaint, ¶ 33.

[27] SEC Complaint, ¶ 33.

[28] SEC Complaint, ¶ 34.

[29] SEC Complaint, ¶ 34.

[30] SEC Complaint, ¶ 35.

[31] SEC Complaint, ¶ 35.

**RPM Records $55.3 Million in One-Time Charges for Q1 Fiscal Year 2013**

79.    On October 3, 2012, RPM issued a press release announcing its fiscal year 2013 first quarter results for the period ended August 31, 2012, in which the Company reported two extraordinary charges totaling $55.3 million unrelated to the DOJ investigation.[32] The press release was attached to a Form 8-K filed by the Company with the SEC on October 3, 2012.

80.    Specifically, the October 3, 2012 Form 8-K states the following regarding the two extraordinary charges in relevant part:

> During the [first] quarter [of fiscal year 2013 ended August 31, 2012], the company incurred a one-time, non-cash charge of $45.3 million for the write-down of its investments in [RPM subsidiary] Kemrock Industries and Exports Limited in India [("Kemrock")], based on deteriorating local economic conditions and their impact on Kemrock's stock price and operating performance. The company also incurred an $11.0 million charge in the roofing division at RPM's Building Solutions Group, principally associated with the strategic decision to exit certain unprofitable contracts outside of North America in order to better focus on the company's successful core roofing business in the U.S. and Canada.

81.    The Board was not happy about the extraordinary, one-time charges.  According to the SEC Complaint, at an Audit Committee meeting on October 2, 2012, the Audit Committee "communicated that '[it] would not be accepting of ongoing extraordinary charges or one-time charges. [The Audit Committee did not] think that that would bode well for the Company and…the impression of [RPM's] shareholders and others of how [RPM] run[s] the business, and [the Audit Committee] made that clear. Similarly, at RPM's annual shareholder meeting on

---

[32] SEC Complaint, ¶¶ 36, 43

October 4, 2012, RPM's CEO [Defendant F. Sullivan] told the shareholders that RPM would not 'water torture them' with additional one-time 'charges quarter after quarter.'"[33]

82.   After receiving those marching orders from the Audit Committee and RPM's CEO, and despite having knowledge at the latest by September 12, 2012 that RPM faced additional charges for at least $11.4 million stemming from the DOJ investigation, Defendant Moore failed to timely disclose this information to the Board.

**RPM Files False and Misleading Statements with the SEC for Q1 2013 for the Period Ended August 31, 2012**

83.   On October 4, 2012, the Company filed Form 10-Q for the first quarter of fiscal year 2013 for the period ended August 31, 2012 ("Q1 2013 Form 10-Q") ") with the SEC reiterating the financial results issued by the Company the day before in a press release. By the time of the filing of the Company's Q1 2013 Form 10-Q with the SEC on October 4, 2012, Defendant Moore already knew it was not only reasonably possible, but probable and reasonably estimable, that RPM would incur a material loss in connection with the DOJ investigation and that the loss was at least $11.4 million.

84.   Despite the disclosure duties imposed by ASC-20 (requiring the disclosure of a material loss contingency or accrual), Item 303 (requiring the disclosure of a trend or uncertainty reasonably expected to have a material unfavorable impact), and Rule 12b-20 (requiring the disclosure of additional material information needed to make the statements in an SEC filing not misleading), neither the October 3, 2012 Form 8-K nor the Q1 2013 Form 10-Q, filed on October 4, 2012, mentioned the DOJ investigation or any required accrual.

85.   As demonstrated by the subsequent restatement of the financial statements contained in the Company's Q1 2013 Form 10-Q, the Company was on notice by August 2012

---

[33] SEC Complaint, ¶ 43.

that the range of RPM's loss was at least $11 million, not factoring in any damages multiplier under the FCA.

86.   Although the Q1 2013 Form 10-Q discussed contingencies, there was no mention of the DOJ investigation. Specifically, the Q1 2013 Form 10-Q  stated the following, in relevant part:

> **NOTE 9 — CONTINGENCIES AND OTHER ACCRUED LOSSES**
>
> We provide, through our wholly owned insurance subsidiaries, certain insurance coverage, primarily product liability coverage, to our other subsidiaries. Excess coverage is provided by third-party insurers. Our reserves provide for these potential losses as well as other uninsured claims. We also offer warranty programs at several of our industrial businesses and have established a product warranty liability. We review this liability for adequacy on a quarterly basis and adjust it as necessary. The primary factors that could affect this liability may include changes in the historical system performance rate as well as the costs of replacement. Provision for estimated warranty costs is recorded at the time of sale and periodically adjusted, as required, to reflect actual experience. It is probable that we will incur future losses related to warranty claims we have received but that have not been fully investigated and related to claims not yet received. While our warranty liability represents our best estimate at August 31, 2012, we can provide no assurances that we will not experience material claims in the future or that we will not incur significant costs to resolve such claims beyond the amounts accrued or beyond what we may recover from our suppliers. Product warranty expense is recorded within selling, general and administrative expense.

87.   The Q1 2013 Form 10-Q also falsely stated that RPM's disclosure controls and procedures were effective. Specifically, the Q1 2013 Form 10-Q  stated the following, in relevant part:

> **ITEM 4. CONTROLS AND PROCEDURES**
>
> (a) EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES.

> Our Chief Executive Officer and Chief Financial Officer, after evaluating the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e)) as of August 31, 2012 (the "Evaluation Date"), have concluded that as of the Evaluation Date, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports we file or submit under the Exchange Act (1) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms, and (2) is accumulated and communicated to our management, including the Chief Executive Officer and the Chief Financial Officer, as appropriate to allow for timely decisions regarding required disclosure.

88.    As later admitted by the Company in connection with its restatement, RPM's disclosure controls were not effective at the end of the first quarter of fiscal year 2013.

89.    On October 19, 2012, the Company filed a prospectus supplement for a $300 million notes offering and incorporated by reference the false and misleading Q1 2013 Form 10-Q ("October 2012 Notes Offering"). The October 12 Notes offering closed on or around October 22, 2012.

## DOJ Conveys a Deadline for Intervention in the FCA Case, and RPM Says It Will Submit a Settlement Offer

90.    On November 5, 2012, the DOJ informed RPM's Counsel that the seal on the FCA Complaint would expire on January 17, 2013, and that DOJ "wanted to make sure that parties are in appropriate posture by that date."[34]  RPM's Counsel conveyed this information to Defendant Moore.[35]  Subsequently, on November 29, 2012, Defendant Moore attended a seminar regarding

---

[34] SEC Complaint, ¶ 46.

[35] SEC Complaint, ¶ 46.

the FCA during which it was discussed that the DOJ typically seeks to settle FCA cases for at least two times the amount of damages sustained from the false claims.[36]

91.  With Defendant Moore's knowledge and authorization, RPM's Counsel sent the DOJ a subsequent analysis on December 14, 2012, reflecting that Tremco had overcharged the government by an additional $487,000.[37]  Following that communication, on December 19, 2012, RPM's Counsel (with Defendant Moore's knowledge and authorization) told the DOJ that RPM would submit a settlement offer to resolve the DOJ investigation and underlying FCA case by January 11, 2013.[38]

92.  On December 21, 2012, RPM's Counsel and certain RPM personnel, including Defendant Moore, held a conference call to discuss RPM's settlement offer.  The components of the settlement offer discussed had grown to $27-$28 million based on subsequent analyses, prior to considering any damages multiplier under the FCA.[39]

93.  On December 28, 2012, in connection with E&Y's fiscal year 2013 second quarter review of RPM for the period ended November 30, 2012, Defendant Moore sent a management representation letter to E&Y falsely stating that "since June 1, 2012, neither I, nor any of the lawyers over whom I exercise general legal supervision, have given substantive attention to or represented the company in connection with, material loss contingencies" exceeding $1.2

---

[36] SEC Complaint, ¶ 47.

[37] SEC Complaint, ¶ 48.

[38] SEC Complaint, ¶ 49.

[39] SEC Complaint, ¶ 50.

million.[40] Further, Moore falsely stated to E&Y that "no claim has been filed" and "no loss contingency exists."[41]

94.   On January 4, 2013, four days prior to RPM's scheduled fiscal year 2013 second quarter Form 10-Q filing for the period ending November 30, 2012 ("Q2 2013 Form 10-Q"), at a RPM Audit Committee meeting attended by E&Y, RPM's CEO (Defendant F. Sullivan), CFO (Defendant Gordon) and Audit Committee Chairman (Defendant Summers), Defendant Moore purportedly provided an update on the DOJ investigation, but failed to disclose (i) the $12 million overcharge estimate by Tremco, (ii) that RPM's Counsel had told the DOJ the Company would submit a settlement offer by January 11, 2013; and (iii) that calculations for the settlement offer had reached $27-28 million.[42]

**RPM Files False and Misleading Statements With the SEC for Q2 2013 for the Period Ended November 30, 2012**

95.   On January 8, 2013, the Company issued a press release announcing the financial results for the second quarter of fiscal year 2013 for the period ended November 30, 2012.[43]  The press release failed to disclose any information or accrual regarding the DOJ investigation.[44] The press release was attached to a Form 8-K filed with the SEC on January 8, 2013 ("January 8, 2013 Form 8-K").

96.   Also on January 8, 2013, RPM filed its Q2 2013 Form 10-Q for the second quarter of fiscal year 2013 and in violation of ASC 450-20, Item 303, and Rule 12b-20, failed to disclose

---

[40] SEC Complaint, ¶ 51.

[41] SEC Complaint, ¶ 52.

[42] SEC Complaint, ¶ 53.

[43] SEC Complaint, ¶ 54.

[44] SEC Complaint, ¶ 54.

any information or accrual regarding the DOJ investigation, including that a material loss relating to the DOJ investigation was probable and estimable by January 8, 2013.[45]

97.   RPM's Q2 2013 Form 10-Q again discussed "contingencies" in the notes to the financial statements and in the MD&A section but omitted any information about the DOJ investigation, which was necessary to make the statements made regarding contingencies not misleading. Specifically, RPM's Q2 2013 Form 10-Q stated the following, in relevant part:

> **NOTE 9 — CONTINGENCIES AND OTHER ACCRUED LOSSES**
>
> We provide, through our wholly owned insurance subsidiaries, certain insurance coverage, primarily product liability coverage, to our other subsidiaries. Excess coverage is provided by third-party insurers. Our reserves provide for these potential losses as well as other uninsured claims.
>
> We also offer warranty programs at several of our industrial businesses and have established a product warranty liability. We review this liability for adequacy on a quarterly basis and adjust it as necessary. The primary factors that could affect this liability may include changes in the historical system performance rate as well as the costs of replacement. Provision for estimated warranty costs is recorded at the time of sale and periodically adjusted, as required, to reflect actual experience. It is probable that we will incur future losses related to warranty claims we have received but that have not been fully investigated and related to claims not yet received. While our warranty liability represents our best estimate at November 30, 2012, we can provide no assurances that we will not experience material claims in the future or that we will not incur significant costs to resolve such claims beyond the amounts accrued or beyond what we may recover from our suppliers. Product warranty expense is recorded within selling, general and administrative expense.

98.   The Q2 2013 Form 10-Q also falsely stated that RPM's internal disclosure controls and procedures were effective. Specifically, RPM's Q2 2013 Form 10-Q stated the following, in relevant part:

---

[45] SEC Complaint, ¶¶ 55-56.

## ITEM 4. CONTROLS AND PROCEDURES

(a)  EVALUATION  OF  DISCLOSURE  CONTROLS  AND
    PROCEDURES.

Our Chief Executive Officer and Chief Financial Officer, after
evaluating the effectiveness of our disclosure controls and
procedures (as defined in Exchange Act Rule 13a-15(e)) as of
November 30, 2012 (the "Evaluation Date"), have concluded that
as of the Evaluation Date, our disclosure controls and procedures
were effective in ensuring that information required to be disclosed
by us in the reports we file or submit under the Exchange Act (1) is
recorded, processed, summarized and reported, within the time
periods specified in the Commission's rules and forms, and (2) is
accumulated and communicated to our management, including the
Chief Executive Officer and the Chief Financial Officer, as
appropriate to allow for timely decisions regarding required
disclosure.

(b) CHANGES IN INTERNAL CONTROL.

There were no changes in our internal control over financial
reporting that occurred during the fiscal quarter ended November
30, 2012 that have materially affected, or are reasonably likely to
materially affect, our internal control over financial reporting.

99.  As of January 8, 2013, when RPM filed its Q2 2013 Form 10-Q with the SEC,

Defendant Moore had falsely told E&Y that the range of loss was approximately $5 million.[46]

**RPM Management Learns the True Extent of the Company's Liability for the DOJ**
**Investigation and FCA Complaint**

100.  On January 10, 2013, two days after the Company filed the January 8, 2013 Form 8-

K and the Q2 2013 Form 10-Q, Defendant Moore informed RPM's CEO (Defendant F. Sullivan)

for the first time that the potential range of loss for the DOJ investigation had grown from $5

million to $28 million.[47] Defendant F. Sullivan was shocked and thought it impossible for the

---

[46] SEC Complaint, ¶ 60.

[47] SEC Complaint, ¶ 61.

range of loss to have grown so significantly between January 8 and 10, 2013.[48]

101. On January 11, 2013, RPM submitted a 44-page settlement offer to the DOJ totaling $28.3 million.[49]  This settlement offer excluded any damages multiplier under the FCA and represented the amount that RPM estimated Tremco overcharged the U.S. Government.[50]

102. On January 22, 2013, the Board held a meeting where the Board and the CFO (Defendant Gordon) learned for the first time that RPM had made a $28.3 million settlement offer to resolve the DOJ investigation and underlying FCA Complaint.[51] Prior to this date, Defendant Gordon and the Board did not know the true range of RPM's reasonably possible or probable loss because (i) Defendant Moore concealed it from them; and (ii) the Company lacked the requisite internal controls to ensure disclosure.[52]

103. On March 29, 2013, the DOJ made a $71 million counteroffer.[53]  Following the DOJ's counteroffer, which included a damages multiplier of 2.5 under the FCA, on April 1, 2013 RPM for the first time since the beginning of the DOJ investigation recorded an accrual for the DOJ investigation, in the amount of $68.8 million, which was reflected on the Company's books as of the third fiscal quarter of fiscal year 2013 for the period ended February 28, 2013.[54]

---

[48] SEC Complaint, ¶ 61.

[49] SEC Complaint, ¶ 62.

[50] SEC Complaint, ¶ 62.

[51] SEC Complaint, ¶ 63.

[52] SEC Complaint, ¶¶ 62, 63.

[53] SEC Complaint, ¶ 64.

[54] SEC Complaint, ¶ 64.

**RPM Files False and Misleading Statements with the SEC for Q3 2013 for the Period Ended February 28, 2013**

104. On April 4, 2013, RPM filed a Form 8-K with the SEC attaching a press release announcing the Company's financial results for the third quarter of fiscal year 2013 for the period ended February 28, 2013 and publicly disclosed for the first time  the DOJ investigation and related accrual ("April 4, 2013 Form 8-K").[55] Later that same day, RPM filed its Q3 2013 Form 10-Q for the period ending February 28, 2013 ("Q3 2013 Form 10-Q") with the SEC that also disclosed the DOJ investigation and related accrual. The Q3 Form 10-Q reported a net loss by RPM of $42.2 million for the third quarter, compared to net income of $7.9 million for the same quarter a one year earlier, with the primary driver of the decline being the $68.8 million accrual for the DOJ investigation. Both the April 4, 2013 Form 8-K and 3Q 2013 Form 10-Q falsely indicated that RPM had timely disclosed and accrued for DOJ investigation in the third quarter of fiscal year 2013, when in fact disclosure and accrual were required in the first and second quarters, as demonstrated by RPM's subsequent restatement.[56]

105. As of April 4, 2013, when RPM publicly disclosed the DOJ investigation, the underlying FCA Complaint remained under seal.[57] The fact that the FCA Complaint remained under seal did not prevent RPM from disclosing the DOJ investigation in an SEC filing.[58]

**Defendant Moore Makes Further Misrepresentations to E&Y About the DOJ Investigation**

106. On June 10, 2013, E&Y met with Defendant Moore in connection with RPM's fiscal year audit and preparation of the Company's Form 10-K for fiscal year 2013.[59] During that

---

[55] SEC Complaint, ¶ 65.

[56] SEC Complaint, ¶ 65.

[57] SEC Complaint, ¶ 66.

[58] SEC Complaint, ¶ 66.

meeting, Moore falsely stated that after RPM filed its Q2 2013 Form 10-Q on January 8, 2013,

RPM completed additional pricing calculations for certain years under investigation and RPM

made the $28 million settlement offer to the DOJ because the government threatened to unseal

the FCA complaint.[60]  Defendant Moore's statements were materially false and misleading

because of the failure to disclose: (i) that RPM told the DOJ on December 19, 2012 that it would

submit a settlement offer by January 11, 2013, weeks before the 2Q 2013 Form 10-Q was filed

with the SEC on January 8, 2013; (ii) the overcharge estimates that RPM had sent to the DOJ

prior to submitting the settlement offer; and (iii) RPM's estimates that the contractual

overcharges had grown to $27-28 million by the time RPM filed its 2Q 2013 Form 10-Q on

January 8, 2013.[61]

**RPM'S 2013 Form 10-K Fails to Disclose Any Material Weaknesses in its Internal Controls and Misleadingly Indicates RPM Timely Disclosed and Accrued for the DOJ Investigation**

107.    On July 24, 2013, RPM filed its Form 10-K for fiscal year 2013 ended May 31,

2013 ("2013 Form 10-K"). The 2013 Form 10-K discussed the DOJ investigation and related

accrual, yet misleadingly stated that RPM timely disclosed and accrued for the DOJ investigation

in the third quarter of fiscal year 2013.

108.    The 2013 Form 10-K stated the following, in relevant part:

> **Estimated Loss on Contingency**
> As previously disclosed, we recorded a $68.8 million accrual during the quarter ended February 28, 2013 associated with settlement discussions with the U.S. Department of Justice (the "DOJ") and the U.S. General Services Administration (the "GSA") Office of Inspector General aimed at resolving an existing

---

[59] SEC Complaint, ¶ 67.

[60] SEC Complaint, ¶ 67.

[61] SEC Complaint, ¶ 68.

investigation. Since first receiving a broad request for documents from the GSA in March 2011, we have cooperated, and continue to cooperate, with that investigation, which involves our compliance with certain pricing terms and conditions of our GSA Multiple Award Schedule contracts under which the roofing division of our Building Solutions Group sold products and services to the federal government. A substantial majority of the transactions as to which potential compliance issues were raised took place during the period from 2002 to 2008.

Following discussions with the DOJ and the GSA in December 2012, we developed and made an initial settlement proposal to the DOJ and the GSA in January 2013. The DOJ and the GSA responded with a counter-proposal in March 2013. Since that time, the parties have been engaged in further negotiations, and we now have an agreement-in-principle with the DOJ and the GSA Office of Inspector General regarding this matter. Assuming that a settlement agreement is finalized, we expect to pay a total of approximately $65.1 million in order to resolve the issues arising out of this investigation and other related costs. We are currently finalizing the terms of a settlement agreement with the DOJ, which we expect to sign during the first quarter of fiscal 2014.

109.    Similarly, the 2013 Form 10-K falsely stated that RPM's internal disclosure controls and procedures were effective. The 2013 Form 10-K  stated, in relevant part:

**Item 9A. Controls and Procedures**.
(a) *Evaluation of disclosure controls and procedures.*
Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, after evaluating the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rule 13a-15) as of May 31, 2013 (the "Evaluation Date"), have concluded that as of the Evaluation Date, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports we file or submit under the Exchange Act (1) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms, and (2) is accumulated and communicated to our management, including the Chief Executive Officer and the Chief Financial Officer, as appropriate to allow for timely decisions regarding required disclosure.
(b) *Management's Report on Internal Control over Financial Reporting.*
Management's Report on Internal Control Over Financial Reporting and the attestation report of Ernst & Young LLP, our independent registered public accounting firm, are set forth at

54

pages 69 and 71, respectively, of the 2013 Annual Report to Stockholders, which reports are incorporated herein by reference.

110.    In August 2013, the Company settled the DOJ investigation and underlying FCA case for $61 million.[62] The settlement was announced by the DOJ in a press release on August 28, 2013.

111.    On December 5, 2013, RPM filed a Prospectus Supplement with the SEC for a $200 million notes offering. The underwriters exercised an option to purchase additional notes, raising the total offering to $205 million. Defendant Moore oversaw the notes offering and reviewed the Prospectus Supplement prior to its filing with the SEC.[63]    The Prospectus Supplement incorporated by reference RPM's SEC filings, including the materially false and misleading 2013 Form10-K, stating that it was important to consider this information. The sale of the notes closed on December 9, 2013.[64]

**E&Y Learns New Facts About the DOJ Investigation, the SEC Initiates a Formal Investigation Into the Timing of RPM's Disclosure of the DOJ Investigation and Underlying FCA Claim, and the Company Issues a Restatement**

112.    On March 31, 2014, RPM sent the SEC staff a written chronology of events related to the DOJ investigation" that discussed RPM's communications with the DOJ in 2012 and 2013 (the "March 31, 2014 Chronology"), which Defendant Moore reviewed and authorized.[65]

113.    On April 5, 2014, E&Y received a copy of the March 31, 2014 Chronology and learned for the first time that, on December 9, 2012, RPM had told the DOJ it would submit a

---

[62] SEC Complaint, ¶ 71.

[63] SEC Complaint, ¶ 72.

[64] SEC Complaint, ¶ 72.

[65] SEC Complaint, ¶¶ 73, 74.

settlement offer prior to January 11, 2013.[66] After learning this, E&Y sent an email to Defendants Moore and Gordon stating that "we had an Audit Committee meeting on January 4, 2013 and the November 30, 2012 10-Q was filed January 8 I believe. At this time, we were told the whole matter was still a $5 million issue."[67]

114.   Subsequently, on April 8, 2014, E&Y met with Defendants Moore and Gordon to discuss the March 31, 2014 Chronology that RPM had submitted to the SEC and a Form S-3 registration statement for which RPM needed consent from E&Y before filing with the SEC.[68] During that meeting, Defendant Moore represented that (i) on December 19, 2012, the range of reasonably possible loss for the DOJ investigation was $0 to $10 million; (ii) the range of reasonably possible loss continued to be $0 to $10 million through January 8, 2013, when RPM's Q2 2013 Form 10-Q was filed; and (iii) the range of loss went from $0 to $10 million up to $28 million, and became probable, between January 8 and 11, 2013.[69]

115.   Defendant Moore's statements to E&Y were false and misleading because Defendant Moore knew that: (i) by December 19, 2012, the estimated overcharges that had been sent to the DOJ totaled nearly $12 million without any damages multiplier under the FCA; (ii) by January 8, 2013, RPM's calculations for its settlement offer had reached $27-28 million; and (iii) RPM's range of reasonably possible or probable loss had reached $27-28 by December

[66] SEC Complaint, ¶ 75.

[67] SEC Complaint, ¶ 75.

[68] SEC Complaint, ¶ 76.

[69] SEC Complaint, ¶ 76.

21, 2012.[70] Based on Defendant Moore's misrepresentations, E&Y provided its consent for the Form S-3, which RPM filed with the SEC.[71]

116.    The SEC notified RPM on June 24, 2014 that it was the subject of a formal investigation stemming from RPM's involvement with the DOJ investigation.[72] The SEC formal investigation was not disclosed publicly until over a month later on July 28, 2014 and when it was disclosed, as described in ¶¶ 118-119, below, the disclosure omitted material information rendering the statements made materially false and misleading.

117.    During the summer of 2014, E&Y learned more facts about the DOJ investigation, including the overcharge estimates that RPM sent to the DOJ in 2012.[73] As a result of that new information, on July 17, 2014, E&Y told RPM it refused to sign off on RPM's annual Form 10-K for fiscal year 2014 ended May 31, 2014, unless RPM conducted an independent investigation regarding its disclosure and accrual for the DOJ investigation.[74] Following E&Y's mandate, the Audit Committee retained purportedly independent counsel to conduct an investigation that took place from late July 2014 through early August 2014.[75]

118.    On July 28, 2014, RPM issued a press release disclosing that it was the subject of a formal SEC investigation over the timing and disclosure of the accrual in connection with the FCA Complaint and that the Audit Committee had retained purportedly independent counsel to conduct an investigation regarding those issues. The press release was attached to a Form 8-K

---

[70] SEC Complaint, ¶ 77.

[71] SEC Complaint, ¶ 77.

[72] RPM Form 8-K filed with the SEC on July 28, 2014.

[73] SEC Complaint, ¶ 79.

[74] SEC Complaint, ¶ 79.

[75] SEC Complaint, ¶ 79.

filed with the SEC on July 28, 2014 ("July 28, 2014 Form 8-K"). The July 28, 2014 Form 8-K

stated the following, in relevant part:

**SEC Investigation as to Fiscal 2013 Timing of GSA Accrual**

RPM was notified by the Securities and Exchange Commission on June 24, 2014, that it is the subject of a formal investigation pertaining to the timing of its disclosure and accrual of loss reserves with respect to the previously disclosed fiscal 2013 GSA and Department of Justice investigation into compliance issues relating to Tremco roofing division's GSA contracts. RPM accrued $68.8 million for a settlement with the GSA during the third quarter of fiscal 2013, which was revised to $65.1 million during the fourth quarter of fiscal 2013, and the investigation was ultimately resolved with a payment to the GSA of $61.9million in the first quarter of fiscal 2014. RPM's audit committee has retained independent counsel to investigate issues surrounding the timing of the disclosure and accruals in question.

RPM believes that the potential financial statement impact of this issue is confined to whether some or all of the reserve accrued in connection with RPM's submission of a settlement proposal during the third quarter of fiscal 2013 should have been recorded during prior quarterly periods of that same fiscal year. As a result, the resolution of this matter is not expected to impact RPM's reported results for the full fiscal year 2013 or fiscal year 2014.

119.     The statements concerning the SEC investigation and the Audit Committee's

purported independent investigation as set forth above in ¶ 118 were materially false and

misleading, as it made it appear that the Board was acting responsibly by voluntarily

commencing an independent investigation upon notice that the SEC was conducting a formal

investigation into the timing and disclosure of the DOJ investigation and the accrual. Rather, the

true reason behind the independent investigation was E&Y's refusal to sign off on the 2014

Form 10-K, which renders the Company's statements materially false and misleading.

120.    On August 10, 2014, the findings of the Audit Committee investigation were shared with E&Y in a conference call.[76] The findings included, among other things: (i) that by the end of the third week of December 2012, it became "known to Ed Moore" that RPM's exposure in the DOJ investigation was "going to jump" from around $11 million to around $28 million; (ii) that RPM's securities "[d]isclosure counsel [was] not aware of the overcharge estimates sent to the DOJ;" and (iii) that Defendant Moore purportedly made "mistakes," including "no disclosure to [E&Y] or audit committee" at the Audit Committee meeting on January 4, 2013.

121.    On August 11, 2014, the Audit Committee directed RPM to restate its financial statements for the first, second and third quarters of fiscal year 2013.[77] RPM's restated financial statements would reflect an $11.4 million accrual for the DOJ investigation in the first quarter (which corresponded to the $11.4 million estimate sent to the DOJ on October 1, 2012), and an additional $16.9 million accrual for the DOJ investigation in the second quarter (for a total accrual of $28.3 million, which corresponded with RPM's settlement offer made to the DOJ on January 11, 2013).[78] The third quarter was also restated to reduce the accrual in the third quarter from $68 million to $40.5 million, because $28.3 million was accrued in the restated first and second quarters.[79]

**RPM Issued Restated Financial Results for Q1, Q2 and Q3 of Fiscal Year 2013**

122.    On August 14, 2014, RPM filed a Form 8-K with the SEC announcing the restatement. The Form 8-K represented that RPM committed "errors" in disclosing and accruing

---

[76] SEC Complaint, ¶ 80.

[77] SEC Complaint, ¶ 81.

[78] SEC Complaint, ¶ 81.

[79] SEC Complaint, ¶ 81.

for the DOJ investigation. The restatement was mandated because the errors were material. RPM's Form 8-K also disclosed that "the restatement reflects a material weakness in the Company's internal control over financial reporting and that its disclosure controls and procedures were not effective" as of the first and second quarters for fiscal year 2013.

123.   Also on August 14, 2014, RPM filed amended Forms 10-Q for the first quarter ended August 31, 2012; and the second quarter ended November 30, 2012. The amended Forms 10-Q, contrary to the original filings, disclosed the DOJ investigation and related accruals indicating that the accruals were RPM's "best estimate of the amount of probable loss" associated with the DOJ investigation.

124.   RPM's restatement and amended SEC filings demonstrate that RPM's original filings for the first three quarters of fiscal year 2013, referenced above, were materially false and misleading. By filing amended Forms 10-Q disclosing the DOJ investigation and related accruals, RPM concedes that not only that a material loss was reasonably possibly on October 4, 2012 and January 8, 2013, when the original Forms 10-Q were filed, but also that a material loss was probable and estimable by those respective dates.

**The SEC Investigation Continues**

125.   After the resolution of the DOJ investigation and subsequent restatement, the SEC investigation into the timing of the disclosure of the DOJ investigation and accruals continued.

126.   On October 8, 2014, the Company filed with the SEC its Form 10-Q for the first quarter of fiscal year 2015 for the period ended August 31, 2014 ("Q1 2015 Form 10-Q"). In connection with the on-going SEC investigation, the Q1 2015 Form 10-Q stated, in relevant part:

## CONTINGENCIES AND OTHER ACCRUED LOSSES

*** 

> We were notified by the SEC on June 24, 2014 that we are the subject of a formal investigation pertaining to the timing of our disclosure and accrual of loss reserves in fiscal 2013 with respect to the previously disclosed GSA and DOJ investigation into compliance issues relating to Tremco Roofing Division's GSA contracts. We are cooperating with the SEC in its ongoing investigation. At this time, we are unable to predict the outcome of this matter or provide any quantification of how the final resolution of this matter may impact our future consolidated financial condition, results of operations or cash flows.

127.    This identical disclosure concerning the SEC investigation was repeated in the Company's Forms 10-Q for the second quarter of fiscal year 2015 for the period ended November 30, 2015 (filed with the SEC on January 7, 2015), and the third quarter of fiscal year 2015, for the period ended February 28, 2015 (filed with the SEC on April 8, 2015). As indicated by the disclosures, RPM was purportedly unable to predict the outcome of the investigation or quantify of how the resolution would impact on the Company's future financial condition, results of operations or cash flows.

128.    While the investigation continued, the Board dismissed E&Y as its independent auditor on April 28, 2015, and appointed Deloitte the Company's new independent auditor, the same accounting firm who had acted as the forensic accountant in the independent investigation conducted by the Audit Committee and found no intentional misconduct on the part of RPM's officers had occurred. This was publicly disclosed when the Company filed a Form 8-K with the SEC on May 4, 2015.

129.    On July 27, 2015, the Company filed with the SEC its Form 10-K for fiscal year 2015 for the period ended May 31, 2015 ("2015 Form 10-K"). The Company now publicly represented that it had incurred "substantial investigation expenses" including "significant legal

and accounting expenditures" and that the "SEC's investigation … could have an adverse impact on our reputation, business, financial condition, results of operation or cash flows." The 2015 Form 10-K stated, in relevant part:

> **Risk Factors**
> We are the subject of an ongoing SEC investigation, which could divert management's focus, result in substantial investigation expenses and have an adverse impact on our reputation and financial condition and results of operations.
>
> We were notified by the SEC on June 24, 2014 that we are the subject of a formal investigation pertaining to the timing of our disclosure and accrual of loss reserves in fiscal 2013 with respect to the previously disclosed GSA and DOJ investigation into compliance issues relating to Tremco Roofing Division's GSA contracts. We are cooperating with the SEC in its ongoing investigation and continue to be engaged in discussions with the staff of the Division of Enforcement concerning potential issues arising out of the SEC's investigation. As previously disclosed, our audit committee completed an investigation into the facts and circumstances surrounding the timing of our disclosure and accrual of loss reserves with respect to the GSA and DOJ investigations, and determined to restate our financial results for the first, second and third quarters of fiscal 2013.
>
> ***We have incurred significant legal and accounting expenditures in connection with the SEC's investigation.*** We are unable to predict how long the SEC's investigation will continue or whether, at the conclusion of its investigation, the SEC will seek to impose fines or take other actions against us. Any action by the SEC could result in sanctions against us and/or certain of our officers. A protracted investigation could impose substantial additional costs and distractions, regardless of its outcome. ***Furthermore, publicity surrounding the foregoing or any enforcement action as a result of the SEC's investigation, even if ultimately resolved favorably for us, could have an adverse impact on our reputation, business, financial condition, results of operations or cash flows.***
>
> (Emphasis added).

130.    On October 29, 2015, RPM filed with the SEC a Form 8-K disclosing that the Company and Defendant Moore received Wells notices (the "Wells Notices") from the SEC on

October 26, 2015, in connection with the SEC investigation ("October 29, 2015 Form 8-K"). The Wells Notices indicated that the SEC staff (the "Staff") "may recommend to the SEC that a civil enforcement action or administrative proceeding be brought" … and that the "Staff had preliminarily determined to recommend that the SEC pursue a clawback claim relating to incentive compensation payments made to … [the Company's] Chief Executive Officer and Chief Financial Officer during the periods of the restatement." The Company's filing made it clear that RPM and Defendant Moore would "contest any charges that may be brought."  The October 29, 2015 Form 8-K stated, in relevant part:

> We are cooperating with the SEC in its investigation and have engaged in discussions with the staff of the SEC's Division of Enforcement (the "Staff") concerning potential issues arising out of the SEC's investigation. On October 26, 2015, we and our General Counsel received Wells notices from the SEC's Division of Enforcement in connection with its investigation. A Wells notice is not a formal allegation or a finding of wrongdoing, but is a preliminary determination by the Staff that it may recommend to the SEC that a civil enforcement action or administrative proceeding be brought against the recipient. ***Our Wells notice also indicated that the Staff had preliminarily determined to recommend that the SEC pursue a clawback claim relating to incentive compensation payments paid to our Chief Executive Officer and Chief Financial Officer during the periods prior to the restatement***. The Staff did not indicate an intention to recommend any charges against either of these officers.
>
> Under SEC procedures, a recipient of a Wells notice has an opportunity to respond in the form of a Wells submission that seeks to persuade the SEC that such an action should not be brought. We intend to provide to the Staff a Wells submission to further explain RPM's views concerning such matters and our belief that no enforcement action is warranted against us or our officers. ***We intend to contest any charges that may be brought***.
>
> (Emphasis added).

131.    On January 6, 2016, the Company filed with the SEC its Form 10-Q for the second quarter of fiscal year 2016 for the period ended November 30, 2015 ("Q2 2016 Form 10-

Q"). The statements regarding the SEC investigation in the Q2 2016 Form 10-Q were almost identical to those in the October 29, 2015 Form 8-K except for the first time, RPM determined that a loss was probable, thereby triggering the recording of an accrual. Still, there was no disclosure of the amount of the accrual other than the Company's representation that "no amount within the estimated range of loss would have a material impact on … [the Company's] consolidated financial condition, results of operations or cash flows." The Q2 2016 Form 10-Q stated, in relevant part:

### CONTINGENCIES AND OTHER ACCRUED LOSSES

***

*Any action by the SEC could result in sanctions against us and/or certain of our officers. A protracted investigation could impose substantial additional costs and distractions, regardless of its outcome. We have determined that it is probable that we will incur a loss relating to this matter and have estimated a range of potential loss. We have accrued* at the low end of the range of loss, as no amount within the range is more likely to occur, and no amount within the estimated range of loss would have a material impact on our consolidated financial condition, results of operations or cash flows.

(Emphasis added).

132.    On April 6, 2016, RPM filed with the SEC its fiscal year 2016 Form 10-Q for the third quarter for the period ended February 29, 2016, ("Q3 2016 Form 10-Q"). The Q3 2016 Form 10-Q reiterated the same disclosures concerning the SEC investigation as the prior Q2 2016 Form 10-Q.

133.    On July 28, 2016, RPM filed with the SEC its Form 10-K for fiscal year 2016 for the period ended May 31, 2016 ("2016 Form 10-K"). The 2016 Form 10-K summarized the DOJ investigation, the restatement, the SEC investigation and receipt of the Wells Notices, and the likelihood of an enforcement action, and, as a result, that the Company had already incurred

64

significant legal and accounting expenditures in connection with the SEC investigation, and represented that an SEC enforcement action "could have an adverse impact on our reputation, business, financial condition, results of operations or cash flows." The 2016 Form 10-K stated the following, in relevant part:

> **Risk Factors**
>
> We are the subject of an ongoing SEC investigation, which could divert management's focus, result in substantial investigation expenses and have an adverse impact on our reputation, financial condition, results of operations and cash flows.
>
> We were notified by the SEC on June 24, 2014 that we are the subject of a formal investigation pertaining to the timing of our disclosure and accrual of loss reserves in fiscal 2013 with respect to the previously disclosed DOJ and GSA investigation into compliance issues relating to Tremco Roofing Division's GSA contracts. As previously disclosed, our audit committee completed an investigation into the facts and circumstances surrounding the timing of our disclosure and accrual of loss reserves with respect to the GSA and DOJ investigations, and determined to restate our financial results for the first, second and third quarters of fiscal 2013. The restatement shifted accrual amounts among the three quarters, which had the effect of reducing net income by $7.2 million and $10.8 million for the quarterly periods ended August 31, 2012 and November 30, 2012, respectively, and increasing net income for the quarterly period ended February 28, 2013 by $18.0 million. These restatements had no impact on our audited financial results for the fiscal year ended May 31, 2013. The audit committee's investigation concluded that there was no intentional misconduct on the part of any of our officers.
>
> We are cooperating with the SEC in its investigation and have engaged in discussions with the staff of the SEC's Division of Enforcement (the "Staff") concerning potential issues arising out of the SEC's investigation. On October 26, 2015, we and our General Counsel received Wells notices from the SEC's Division of Enforcement in connection with its investigation. A Wells notice is not a formal allegation or a finding of wrongdoing, but is a preliminary determination by the Staff that it may recommend to the SEC that a civil enforcement action or administrative proceeding be brought against the recipient. Our Wells notice also indicated that the Staff had preliminarily determined to recommend that the SEC pursue a clawback claim relating to incentive

compensation payments paid to our Chief Executive Officer and Chief Financial Officer during the periods prior to the restatement. The Staff did not indicate an intention to recommend any charges against either of these officers.

Under SEC procedures, a recipient of a Wells notice has an opportunity to respond in the form of a Wells submission that seeks to persuade the SEC that such an action should not be brought. We have provided to the Staff a Wells submission further explaining RPM's views concerning such matters and our belief that no enforcement action is warranted against us or our officers. We intend to contest any charges that may be brought.

***We have incurred significant legal and accounting expenditures in connection with the SEC's investigation.*** We are unable to predict how long the SEC's investigation will continue or whether, at the conclusion of its investigation, the SEC will seek to impose fines or file an enforcement action against us. Any action by the SEC could result in sanctions against us and/or certain of our officers. A protracted enforcement action could impose substantial additional costs and distractions, regardless of its outcome. Furthermore, publicity surrounding an enforcement action, even if ultimately resolved favorably for us, ***could have an adverse impact on our reputation, business, financial condition, results of operations or cash flows.***

(Emphasis added).

134.    On September 9, 2016, the SEC filed an enforcement action against RPM and

Defendant Moore stemming from RPM's and Defendant Moore's failure to timely disclose a loss

contingency and record an accrual for the FCA violations underlying the DOJ Investigation.  The

SEC Complaint details RPM's and Moore's knowing and intentional failure to disclose the loss

contingency relating to the DOJ investigation, failure to timely record an accrual on the

Company's books for the loss contingency, and the Board's complicity in concealing Defendant

Moore's misconduct as demonstrated by the Board's failure to take any action whatsoever until

threatened by E&Y with the nuclear option of not signing off on the Company's fiscal year 2014

audit unless the Board conducted an independent investigation, which, of course, led to the

restatement. The SEC Complaint further describes the numerous false and misleading statements RPM filed with the SEC. This was the first time the true reason behind the Board's motive to institute an independent investigation was publicly disclosed. It was not due to the SEC's notice to the Company of a formal investigation as RPM made it appear in its SEC filings. Rather, it was E&Y's threat to not sign off on the audit of the Company's 2014 Form 10-K, an action that would have catastrophic to RPM, that prompted the Audit Committee to hire outside counsel and hastily conduct an investigation that lasted a little over two weeks.

135.    As a result of RPM's and Defendant Moore's misconduct described in the SEC Complaint, the SEC alleged that RPM violated "antifraud, reporting, books and records, and internal control provisions of the securities laws, including Sections 17(a)(2) and (a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§77q(a)(2) and 77q(a)(3)]; Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Securities and Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)]; and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13]."[80]   The SEC also stated that "unless restrained and enjoined, RPM will violate those provisions again in the future."[81]

136.    Similarly, as a result of the misconduct described in the SEC Complaint, the SEC stated that Defendant Moore violated "antifraud, reporting, books and records, and misleading accountant or auditor provisions of the securities laws, including Sections 17(a)(2) and (a)(3) of the Securities Act of 1933 [15 U.S.C. §§77q(a)(2) and 77q(a)(3)], and Exchange Act Rules 13b2-

---

[80] SEC Complaint, ¶ 8.

[81] SEC Complaint, ¶ 8.

1 and 13b2-2(a) [17 C.F.R. §§240.13b2-1 and 240.13b2-2(a)]."[82]  The SEC also stated that "unless restrained and enjoined, Moore will violate those provisions again in the future."[83]

137.    On September 12, 2016, in a Form 8-K, the Company publicly disclosed the SEC enforcement action against RPM and Defendant Moore filed on September 9, 2012 ("September 12, 2016 Form 8-K").  The Company took the position that the SEC Complaint's allegations mischaracterized RPM's and Defendant Moore's actions in connection with the DOJ investigation and are without merit. In a rather unusual maneuver and recognizing their own liability for attempting to cover up Defendant Moore's misconduct, the Board specifically took the position that it had the utmost confidence in Defendant Moore's 'integrity and ability and believe he conducted himself … professionally, ethically, and honestly, … and will continue to serve as the company's Senior Vice President, General Counsel and Chief Compliance Officer." It is clear from these statements that the Board is predisposed to exonerate Defendant Moore (and themselves) should a litigation demand be made. The September 12, 2016 Form 8-K stated the following, in relevant part:

> On September 9, 2016, the Securities and Exchange Commission ("SEC") filed an enforcement action against RPM International Inc. ("RPM") and RPM's General Counsel Edward W. Moore in connection with the company's previously disclosed restatement of its results for the first, second and third quarters of fiscal 2013. The restatements had no impact on the audited results for the fiscal year ended May 31, 2013, and the company's audit committee concluded that there was no intentional misconduct on the part of any of its officers.
>
> RPM has cooperated with the SEC's investigation and ***believes the allegations mischaracterize both the company's and Mr. Moore's***

---

[82] SEC Complaint, ¶ 9.

[83] SEC Complaint, ¶ 9.

*actions in connection with the matters related to the company's
quarterly results in fiscal 2013 and are without merit.*

*The RPM Board of Directors has the utmost confidence in Mr.
Moore's integrity and ability and believe he conducted himself in
this matter professionally, honestly, and ethically*, consistent with
his outstanding reputation earned over a distinguished legal career
spanning more than 30 years. The company said Mr. Moore will
continue to serve as the company's Senior Vice President, General
Counsel and Chief Compliance Officer.

*RPM will contest the allegations in the complaint vigorously and
is confident it will prevail at trial.*

(Emphasis added).

138.    On October 5, 2016, the Company filed with the SEC its fiscal year 2017 Form
10-Q for the first quarter for the period ended August 31, 2016 ("Q1 2017 Form 10-Q"), which
provided an update on the SEC enforcement action.  The Q1 2017 Form 10-Q stated, in relevant
part:

### CONTINGENCIES AND OTHER ACCRUED LOSSES

We were notified by the SEC on June 24, 2014, that we are the
subject of a formal investigation pertaining to the timing of our
disclosure and accrual of loss reserves in fiscal 2013 with respect
to the previously disclosed U.S. Department Of Justice (the
"DOJ") and the U.S. General Services Administration (the "GSA")
Office of Inspector General investigation into compliance issues
relating to Tremco Roofing Division's GSA contracts. As
previously disclosed, our audit committee completed an
investigation into the facts and circumstances surrounding the
timing of our disclosure and accrual of loss reserves with respect to
the GSA and DOJ investigations, and determined that it was
appropriate to restate our financial results for the first, second and
third quarters of fiscal 2013.  These restatements had no impact on
our audited financial statements for the fiscal years ended May 31,
2013 or 2014. The audit committee's investigation concluded that
there was no intentional misconduct on the part of any of our
officers.

In connection with the foregoing, on September 9, 2016, the SEC
filed   an   enforcement   action   against   us   and   our   General

Counsel. We have cooperated with the SEC's investigation and believe the allegations in the complaint mischaracterize both our and our General Counsel's actions in connection with the matters related to our quarterly results in fiscal 2013 and are without merit. We intend to contest the allegations in the complaint vigorously.

The action by the SEC could result in sanctions against us and/or our General Counsel and could impose substantial additional costs and distractions, regardless of its outcome. We have determined that it is probable that we will incur a loss relating to this matter and have estimated a range of potential loss. We have accrued at the low end of the range of loss, as no amount within the range is more likely to occur, and no amount within the estimated range of loss would have a material impact on our consolidated financial condition, results of operations or cash flows.

## LEGAL PROCEEDINGS

### *SEC Investigation and Enforcement Action*

As previously disclosed, we were notified by the SEC on June 24, 2014, that we are the subject of a formal investigation pertaining to the timing of our disclosure and accrual of loss reserves in fiscal 2013 with respect to the previously disclosed DOJ and GSA Office of Inspector General investigation into compliance issues relating to Tremco Roofing Division's GSA contracts. As previously disclosed, our audit committee completed an investigation into the facts and circumstances surrounding the timing of our disclosure and accrual of loss reserves with respect to the GSA and DOJ investigations, and determined that it was appropriate to restate our financial results for the first, second and third quarters of fiscal 2013. These restatements had no impact on our audited financial statements for the fiscal years ended May 31, 2013 or 2014.  The audit committee's investigation concluded that there was no intentional misconduct on the part of any of our officers.

In connection with the foregoing, on September 9, 2016, the SEC filed an enforcement action in the U.S. District Court for the District of Columbia against us and our General Counsel.  We have cooperated with the SEC's investigation and believe the allegations in the complaint mischaracterize both our and our General Counsel's actions in connection with the matters related to our quarterly results in fiscal 2013 and are without merit. The complaint seeks disgorgement of gains that may have resulted from the conduct alleged in the complaint, and payment of unspecified monetary penalties from us and our General Counsel pursuant to Section 20(d) of the Securities Act and Section

21(d)(3) of the Exchange Act. Further, the complaint seeks to permanently enjoin us from violations of Sections 17(a)(2) and (a)(3) of the Securities Act, Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13, and to permanently enjoin our General Counsel from violations of Sections 17(a)(2) and (a)(3) of the Securities Act and Exchange Act Rules 13b2-1 and 13b2-2(a). We intend to contest the allegations in the complaint vigorously.

139.     The Company's Forms 10-Q for the second and third quarters, filed with the SEC on January 9, 2017 ("Q2 2017 Form 10-Q") and April 6, 2017 ("Q3 2017 Form 10-Q"), respectively, contained identical disclosures concerning the SEC Complaint as the Q1 2017 Form 10-Q set forth above, except the Company disclosed in the Q3 2017 Form 10-Q that the Company and Defendant Moore had each filed a motion to dismiss the SEC Complaint on February 24, 2017.

## DAMAGES TO RPM CAUSED BY THE INDIVIDUAL DEFENDANTS

140.     As a direct and proximate result of the Individual Defendants' misconduct, The Individual Defendants caused RPM to fail to maintain proper internal accounting controls, caused the Company to issue false and misleading statements, and substantially damaged the Company's credibility, corporate image and goodwill.

141.     In connection with the SEC investigation and SEC Complaint, RPM has already admitted that the Company has expended and will continue to expend significant sums of money. Specifically, in its Q3 Form 10-Q FY 2017, the Company stated, in relevant part:

> The action by the SEC *could result in sanctions against us and/or our General Counsel* and *could impose substantial additional costs and distractions, regardless of its outcome.* We have determined *that it is probable that we will incur a loss relating to this matter and have estimated a range of potential loss*. We have accrued at the low end of the range of loss, as no amount within the range is more likely to occur, and no amount within the estimated range of loss would have a material impact on our consolidated financial condition, results of

operations or cash flows.

(Emphasis added).

142.    Further, in its 2016 Form 10-K, RPM stated the following, in relevant part:

We are the subject of an ongoing SEC investigation, which could divert management's focus, result in substantial investigation expenses and have an adverse impact on our reputation, financial condition, results of operations and cash flows.

\*\*\*

We have incurred significant legal and accounting expenditures in connection with the SEC's investigation.  We are unable to predict how long the SEC's investigation will continue or whether, at the conclusion of its investigation, the ***SEC will seek to impose fines or file an enforcement action against us.  Any action by the SEC could result in sanctions against us and/or certain of our officers.  A protracted enforcement action could impose substantial additional costs and distractions, regardless of its outcome.  Furthermore, publicity surrounding an enforcement action, even if ultimately resolved favorably for us, could have an adverse impact on our reputation, business, financial condition, results of operations or cash flows.***

(Emphasis added).

143.    Additional expenditures and  damages that the Company has incurred as a result of the Individual Defendants' breaches of their fiduciary duty include:

a.    costs incurred from investigating, defending and paying any settlement or judgment in connection with the SEC investigation and SEC Complaint for violations of federal securities laws and governing accounting principles;

b.    compensation and benefits the Company paid to Defendants Gordon, Moore and F. Sullivan, who have breached their duties to RPM;

    *c.* costs incurred in auditing and issuing accurate financial statements that comply with GAAP that were previously rendered unreliable due to the lack of adequate internal control over financial reporting;

    *d.* costs incurred in retaining an outside law firm and forensic accountants to conduct an independent investigation; and

    *e.* other costs relating to the restatement of the Forms 10-Q for the first, second and third quarters of fiscal year 2013.

144. Moreover, these actions have irreparably damaged RPM's corporate image and goodwill.

## <u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>

145. Plaintiff brings this action derivatively in the right and for the benefit of RPM to redress injuries suffered, and to be suffered, by RPM as a direct result of breaches of fiduciary duty and unjust enrichment.

146. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

147. RPM is named as a nominal defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Plaintiff is and was a shareholder of RPM at the time of the transgressions complained of and continues to own the stock of the Company. Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

148. The wrongful acts complained of herein subject, and will continue to subject, RPM to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

149.    The wrongful acts complained of herein were unlawfully concealed from RPM's shareholders.

150.    The current Board of Directors consists of the following eleven Individual Defendants: Abizaid (served as director since 2008), Carbonari (served as director since 2002), Daberko (served as director since 2007), Deckard (served as director since 2015), Fazzolari (served as director since 2013), Gross (served as director since 2012), Morford (served as director since 2013), Nance (served as director since 2007), F. Sullivan (served as director since 1995), Summers (served as director since 2004), and Thornton (served as director since 1999) (collectively, the "Current Director Defendants").

151.    The Current Director Defendants violated multiple corporate governance principles, thus representing evidence of the Individual Defendants' breaches of fiduciary duties.

152.    The wrongful acts complained of herein show a wholesale abandonment by the Individual Defendants, including the Current Directors, of their fiduciary duties of due care and oversight.  Such abandonment includes, but is not limited to the following:

> *a.*  Allowing for materially inadequate controls over the Company's policies and practices with respect to financial reporting and disclosure;
>
> *b.*  Allowing the Company to file materially false and misleading periodic reports and other filings with the SEC in violation of federal rules and regulations;
>
> *c.*  Allowing the Company to fail to disclose pertinent, material, and important information in a timely manner;
>
> *d.*  Failing to take appropriate remedial action when the Board knew, or should have known, of Defendant Moore's misconduct; and

e. Failing to adhere to the Company's applicable Code of Business Conduct and Ethics, and Role in Risk Oversight guidelines by concealing Defendant Moore's misconduct in connection with the DOJ investigation and by knowingly misrepresenting the impetus of the Audit Committee investigation.

153.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Current Director Defendants to institute this action, as such demand would be a futile and useless act since a majority of the Current Directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, as the Board is complicit in making materially false and misleading statements and concealing the misconduct of Defendant Moore.

**The Company Admits Defendant F. Sullivan is Not Independent**

154.    Pursuant to the Company's 2017 Proxy, RPM admits that Defendant F. Sullivan is not independent and stated that F. Sullivan "is not considered to be independent because of his position as Chairman and Chief Executive Officer of RPM."

**The Current Board Faces a Substantial Risk of Liability for Their Own Culpability Vis-à-vis the SEC Investigation, the Audit Committee Investigation and the SEC Complaint**

155.    The July 28, 2014 Form 8-K was the first public disclosure of the SEC investigation as well as the Audit Committee investigation.  The July 28, 2014 Form 8-K stated the following, in relevant part:

> **SEC Investigation as to Fiscal 2013 Timing of GSA Accrual**
> *RPM was notified by the Securities and Exchange Commission on June 24, 2014, that it is the subject of a formal investigation* pertaining to the timing of its disclosure and accrual of loss reserves with respect to the previously disclosed fiscal 2013 GSA and Department of Justice investigation into compliance issues relating to Tremco roofing division's GSA contracts. RPM accrued $68.8 million for a settlement with the GSA during the third quarter of fiscal 2013, which was revised to $65.1 million during the fourth quarter of fiscal 2013, and the investigation was

ultimately resolved with a payment to the GSA of $61.9 million in the first quarter of fiscal 2014. ***RPM's audit committee has retained independent counsel to investigate issues surrounding the timing of the disclosure and accruals in question.*** (Emphasis added).

156. By disclosing the Audit Committee investigation in conjunction with the SEC investigation, the Current Director Defendants (other than Defendant Deckard) misled the SEC, the Company's shareholders and the investing public by making it appear that the SEC's investigation prompted the Audit Committee independent investigation. To the contrary, E&Y threatened to not sign off on the fiscal year 2014 Form 10-K unless the Audit Committee conducted an independent investigation. Moreover, despite learning of the SEC's investigation on June 24, 2014, RPM waited more than one month to disclose the SEC investigation.

157. The materially false and misleading statements regarding the reason for the Audit Committee's independent investigation create a substantial risk of liability for the Current Director Defendants and demonstrate that the Board was attempting to conceal Defendant Moore's misconduct, thus creating a substantial risk of liability for the Board itself.

158. According to the Company's proxy statement filed on Schedule 14A with the SEC on August 25, 2005 ("the 2006 Proxy"), E&Y served as RPM's independent public auditor since fiscal year 2006, replacing the firm of Ciulla, Smith & Dale, LLP.[84] According to a Form 8-K filed by the Company with the SEC on October 14, 2015 ("October 14, 2015 Form 8-K"), RPM replaced E&Y Deloitte for fiscal year 2016.

159. By replacing E&Y with Deloitte as the Company's independent public auditor, the Current Director Defendants seemingly punished E&Y for forcing the Audit Committee to

---

[84] According to RPM's Schedule 14A filed with the SEC on August 30, 1994 ("1995 Proxy"), Ciulla, Smith & Dale, LLP had served as the Company's auditor since 1964.

conduct the independent investigation. Deloitte validated, at least in part, the Audit Committee's conclusion per the independent investigation that none of RPM's officers engaged in intentional misconduct with respect to the DOJ investigation and underlying FCA Complaint. Deloitte was rewarded handsomely by being appointed the Company's new independent auditing firm for fiscal year 2016. The RPM account has generated substantial audit fees, ranging from $5 million to $7 million per annum.

160.     Additionally, based on each of their classification as an "audit committee financial expert", Current Director Defendants Carbonari, Fazzolari, Gross and Summers recognized, or should have recognized, that Defendant Moore's failure to disclose the DOJ investigation and related loss contingency dating back to September 12, 2012, at the latest, was not a mere mistake on Defendant Moore's part. However, in stark contrast to the allegations in the SEC Complaint, after only a brief two week investigation ranging from late July 2014 through early August 2014, the Audit Committee exonerated Defendant Moore stating that none of RPM's officers engaged in any intentional misconduct. Therefore, Current Director Defendants Carbonari, Fazzolari, Gross and Summers face substantial risk of liability since they conducted an investigation and concluded that there was no intentional misconduct on the part of any of RPM's officers.

161.     The Current Director Defendants have further evidenced their impartiality by failing to "clawback" any of the compensation paid to Defendants Gordon, Moore or F. Sullivan for fiscal years 2013 and 2014.  As set forth in RPM's 2016 Proxy, the Board may clawback executive compensation pursuant to the following policy:

>   **Policy on Clawback of Executive Compensation**
>   In July 2012, the Board of Directors adopted a policy regarding the clawback of executive compensation. If, as the result of the gross negligence or willful misconduct of any executive officer of the

Company, the Company is required to restate all or a portion of its financial statements, the Board of Directors will, to the extent permitted by governing law, require reimbursement of any bonus or incentive compensation awarded to such executive officer or effect the cancellation of unvested restricted or deferred stock awards or stock options previously granted to the executive officer if:

- The amount of the bonus, incentive compensation or stock or option award was calculated based upon the achievement of certain financial results that were subsequently the subject of a restatement,
- The amount of the bonus, incentive compensation or stock or option award that would have been awarded to the executive officer had the financial results been properly reported would have been lower than the amount actually awarded, and
- It is reasonable to do so (e.g., the expense of recovering the compensation does not exceed the amount recovered).

162.     Further, Individual Defendants Gordon, Moore and Current Director Defendant F. Sullivan were compensated handsomely throughout the Relevant Period, and their compensation was based at least in part on the Company's performance included in the false and misleading filings at issue. Despite the subsequent restatement of the Company's financials and the SEC Complaint, the Current Director Defendants failed to follow RPM's policy and "clawback" compensation of Defendants Gordon, Moore and F. Sullivan.

163.     Additionally, the Current Director Defendants have been, or should have been, aware of the risks of non-compliance with federal, state and local government procurement regulations and requirements throughout the Relevant Period. Specifically, RPM included the risk factors associated with federal, state and local government procurement regulations and requirements faced by the Company in its 2013-2016 Forms 10-K, stating the following, in relevant part:

> **Risk Factors**
> We could be adversely affected by failure to comply with federal, state and local government procurement regulations and requirements.

> We have contracts with federal, state and local governmental entities, and are required to comply with specific procurement regulations and other requirements relating to those contracts. These requirements, although customary in government contracts, impact our performance and compliance costs. Failure to comply with procurement regulations and requirements could result in reductions of the value of contracts, contract modifications or termination, and the assessment of penalties and fines, which could negatively impact our results of operations and financial condition. Our failure to comply with these regulations and requirements could also lead to suspension or debarment, for cause, from government contracting or subcontracting for a period of time, which could have a negative impact on our results of operations and financial condition and could have a negative impact on our reputation and ability to procure other government contracts in the future

164.    As described above, the Current Director Defendants face a substantial likelihood of liability, rendering them incapable of independently exercising their business judgment and making demand futile.

**The Board is Predisposed to Refuse a Litigation Demand by Plaintiff**

165.    As a result of the Current Director Defendants' false and misleading statements regarding the impetus of the Audit Committee's independent investigation, if the Current Director Defendants decided to initiate a lawsuit in response to a litigation demand by Plaintiff, the resulting lawsuit would need to be brought against the Current Director Defendants themselves. Clearly, the Current Director Defendants would not decide to sue themselves. Thus, as a result of the substantial risk of liability facing the Current Director Defendants, the Current Director Defendants are predisposed to refuse any litigation demand by Plaintiff.

166.    Further, the Current Director Defendants' are incapable of impartially fielding a litigation demand because they have shown their predisposition to deny such a demand, as evidenced by the Board's proclamation that the SEC Complaint mischaracterizes the actions of both Defendant Moore and RPM. Specifically, in a Form 8-K filed with the SEC on September

12, 2016 ("September 12, 2016 Form 8-K"), the Board made the following statement regarding

the SEC Complaint:

> The **RPM Board of Directors has the utmost confidence in Mr. Moore's integrity and ability and believe he conducted himself in this matter professionally, honestly, and ethically**, consistent with his outstanding reputation earned over a distinguished legal career spanning more than 30 years. The company said Mr. Moore will continue to serve as the company's Senior Vice President, General Counsel and Chief Compliance Officer

> (Emphasis added).

167.    Further, in its Form 10-Q for the third quarter of fiscal year 2017 for the period

ended February 28, 2017 filed with the SEC on April 6, 2017 ("Q3 2017 Form 10-Q"), RPM

stated that the Audit Committee (which at that point in time was comprised of Individual

Defendants Fazzolari (who served as Chairman); Carbonari; Gross and Summers) found Moore

had merely made mistakes in connection with the DOJ investigation. Specifically, the Q3 2017

Form 10-Q stated the following, in relevant part:

> **The audit committee's investigation concluded that there was no intentional misconduct on the part of any of our officers.**

> (Emphasis added).

168.    The Q3 2017 Form 10-Q also stated the following with respect to the allegations

in the SEC Complaint:

> RPM has cooperated with the SEC's investigation and **believes the allegations mischaracterize both the company's and Mr. Moore's actions in connection with the matters related to the company's quarterly results in fiscal 2013 and are without merit**.

> **RPM will contest the allegations in the complaint vigorously and is confident it will prevail at trial**

> (Emphasis added).

169.    There can be no question that based on the Board's statement in the September 12, 2016 Form 8-K that Moore "conducted himself in this matter professionally, honestly, and ethically," in addition to the fact that the Audit Committee has concluded that the independent investigation revealed mere mistakes rather than intentional conduct on Defendant Moore's part, that the Board takes the same position as the Company, based on the Board's own statements.

170.    The Current Director Defendants have shown that they cannot exercise their fiduciary duty to impartially evaluate any litigation demand Plaintiff would make, as the Board already made clear its predisposition to deny a litigation demand by stating: (i) that the SEC Complaint lacks merit; (ii) that the SEC Complaint mischaracterizes the actions of Defendant Moore and RPM vis-à-vis the DOJ investigation and corresponding accruals and disclosure; and (iii) that the Audit Committee investigation merely revealed mistakes which did not rise to the level of intentional misconduct; and (iv) that they have the utmost confidence in Defendant Moore's integrity and ability, and that he conducted himself professionally, honestly and ethically in connection with the DOJ investigation.

171.    Thus, because the Current Director Defendants have already reached the aforementioned conclusions regarding the SEC Complaint, and because the instant action is substantially based on the same and/or similar misconduct as the SEC Complaint, the Current Director Defendants are incapable of making an impartial decision to institute and vigorously prosecute this derivative action.

**A Majority of the Current Director Defendants Are Not Independent Due to Longstanding Professional Relationships with Each Other & Related Party Transactions**

172.    RPM has admitted in its 2013 Proxy Statement through its 2017 Proxy Statement ("Relevant Period Proxy Statements") that several of the Company's executive officers and Directors serve on common private and charitable boards together, including Current Director

Defendants Deckard, Thornton, Daberko, Nance, Ratner and Summers. Specifically, the 2017 Proxy states, in relevant part:

> **Board Independence**
> As part of this review, the Board of Directors also considered common private and charitable board memberships among our executive officers and Directors, including ***Ms. Deckard,*** Dr. Thornton and Messrs. Daberko, Nance, Ratner and Summers. The Board of Directors does not believe that any of these common board memberships impairs the independence of the Directors

173. The independence of Current Director Defendants Deckard, Nance, F. Sullivan, Summers and Thornton is tainted based on the commonality of service on the boards of charitable organizations, evidencing their longstanding professional relationships. Specifically, the Relevant Period Proxy Statements reflect the following commonality of charitable board membership:

  a) Defendants F. Sullivan and Summers currently serve on the board of the Army War College Foundation together.

  b) Defendants Deckard and Ratner currently serve on the board of the Cleveland Foundation together.

  c) Defendants F. Sullivan, Summers and Thornton currently serve on the board of the Cleveland Rock and Roll Hall of Fame together.

  d) Defendants Nance, F. Sullivan and Thornton currently serve on the board of the Greater Cleveland Partnership together.

  e) Defendants Ratner and Thornton currently serve on the board of the United Way of Greater Cleveland together.

> f)   Defendants Daberko and Thornton are both affiliated with University Hospitals of Greater Cleveland, as Defendant Daberko is currently a trustee and Defendant Thornton currently serves on the board.

174.   RPM has repeatedly stated in the Relevant Period Proxy Statements that these common affiliations do not impair the independence of the Current Director Defendants. However, the combination of the Current Director Defendants' common affiliations and the Board's statements regarding (i) the SEC investigation, (ii) the Audit Committee investigation, and (iii) the SEC Complaint serves to further taint the independence of Current Director Defendants Daberko, Deckard, Fazzolari, Nance, F. Sullivan, Summers and Thornton.

175.   While the Company disclosed the common affiliations with various private and charitable boards for certain of the Individual Defendants, including the Current Director Defendants in the Relevant Period Proxy Statements, RPM failed to name the common affiliations on private and charitable boards of RPM's executive officers (except for Defendant F. Sullivan who is also a Director).  Given the numerous common affiliations amongst the Board, there are undoubtedly affiliations amongst the unnamed executive officers which should be disclosed by RPM. RPM admits that such affiliations exist amongst its executive officers in the Relevant Period Proxy Statements, yet fails to disclose the names of those executive officers.

176.   Similarly, the independence of Current Director Defendants Daberko, Fazzolari and Thornton is tainted based on commonality of employment with other companies, evidencing their longstanding professional relationships. Specifically, the Relevant Period Proxy Statements reflect the following commonality of private board membership:

> a)   Defendants Ratner and Thornton served as directors of American Greetings Corporation from 2001 through 2013 and 2000 through 2013, respectively

b) Defendants Fazzolari and Viviano were both affiliated with Harsco Corporation, as Defendant Fazzolari was an executive from as early as !998 until his retirement in 2012, and Defendant Viviano served as a director from 1998 through 2008.[85]

c) Defendants Daberko and Thornton were both affiliated with National City, as Defendant Daberko was an executive of National City from 1987 until he retired from his role as Chairman and Chief Executive Officer in 2007 and Defendant Thornton served as a director from 2001 through 2008.

177.    Additionally, with respect to Current Director Defendant Deckard, she has served on the Board since October 8, 2015 and has served as President, Chief Executive Officer and director of Fairmount Santrol since 2013. During fiscal years 2016 and 2015, RPM purchased products and services from Fairmount Santrol totaling $1.8 million and $1.5 million, respectively. Accordingly, in addition to commonality of charitable board membership between Defendants Deckard and Ratner, Current Director Defendant Deckard's independence is further tainted by the related party transactions between RPM and Fairmount Santrol.

178.    Further, Current Director Defendant Gross has served on RPM's Board since 2012 and served as Vice Chairman and Chief Operating Officer of Eaton prior to his retirement in August 2015. RPM purchased products and services from Eaton as follows: FY2012 - $600,000, FY2013 - $105,000, FY2014 - $140,000, FY2015 - $300,000, and FY2016 -

---

[85] Defendant Viviano served as a Director of RPM during the time of the misconduct described in the SEC Complaint until his resignation on October 8, 2015. Defendant Fazzolari was the Chairman of the Audit Committee during the time of the Audit Committee investigation into the misconduct subsequently described in the SEC Complaint. Accordingly, it is not surprising that the Audit Committee found no evidence of intentional misconduct on the part of any of RPM's officers, as if the Audit Committee would have reached a different conclusion, Defendant Fazzolari would have been forced to bring an action against his former crony, Defendant Viviano.

$300,000. Accordingly, Current Director Defendant Gross's independence is tainted by the related party transactions between RPM and Eaton.

179.    Despite overwhelming evidence to the contrary, the Current Director Defendants have taken the position that the SEC mischaracterized Defendant Moore's and RPM's actions and intend to vigorously defend against the SEC's allegations. The Current Director Defendants' statements regarding the SEC Complaint and Defendant Moore make crystal clear that at this point, the Current Director Defendants are only concerned with protecting themselves from their prior misdeeds.

180.    In summary, the Current Director Defendants have demonstrated that their opinion with respect to Plaintiff's allegations is infected and as such, Plaintiff is not required to make a litigation demand on the Board.  Furthermore, as a result of the commonality of several of the Individual Defendants' affiliations with private and charitable boards, as well as the related party transactions for Defendants Deckard and Gross, the independence of the of the Current Director Defendants is tainted. Accordingly, demand upon the Current Director Defendants is excused as being futile.

## CAUSES OF ACTION
### COUNT I
**(Against The Individual Defendants for Breach of Fiduciary Duty)**

181.    Plaintiff incorporates by reference and realleges each of the foregoing allegations  as though fully set forth herein.

182.    The Individual Defendants owed and  owe RPM fiduciary obligations, including the obligations of good faith, fair dealing, loyalty and care. Among other things, the Individual Defendants owed a  fiduciary duty to RPM to supervise the issuance of its press

releases and public filings and ensure  that they were truthful, accurate and conformed to federal and state securities laws.  The Individual Defendants breached their fiduciary duties by:

    *a.*   Allowing for materially inadequate controls over the Company's policies and practices with respect to financial reporting and disclosure;

    *b.*   Allowing the Company to file materially false and misleading periodic reports with the SEC and other SEC filings, in violation of federal rules and regulations and thereby subjecting the Company to the SEC investigation and SEC Complaint;

    *c.*   Allowing the Company to fail to disclose pertinent, material, and important information in a timely manner;

    *d.*   Failing to take appropriate remedial action when the Board knew, or should have known, of Defendant Moore's misconduct (by no later than June 24, 2014); and

    *e.*   Failing to adhere to the Company's applicable Code of Business Conduct and Ethics and Role in Risk Oversight guidelines.

183.    By reason of the foregoing, RPM was damaged.

## COUNT II

### (Against the Individual Defendants for Waste of Corporate Assets)

184.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

185.    Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of RPM's internal controls and by allowing the Company to engage in an illegal, unethical and improper course of conduct.

86

186.    As a result of the Individual Defendants' illicit course of conduct and breaches of fiduciary duty, the Company has incurred significant potential liability for legal costs, penalties, fines, and/or legal fees in connection with the defense of the  Individual Defendants' unlawful course of conduct complained of herein.

187.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

188.    By reason of the foregoing, RPM was damaged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Directing Defendants to account to RPM for all damages sustained  or to be sustained by the Company by reason of the wrongs alleged herein;

B.    Directing RPM to take all necessary actions to reform its corporate governance  and internal procedures to comply with applicable laws and protect the Company and its shareholders from a recurrence of the events described herein, including,  but not limited to, a shareholder vote resolution for amendments to RPM's By-Laws or Articles of Incorporation and taking such other action as may be  necessary to place before shareholders for a vote on corporate governance  policies;

C.    Awarding to RPM restitution from the Defendants and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants.

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

E.    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated:  April 28, 2017


                                  Respectfully Submitted,


                                  By:*/s/*Richard S. Wayne_____

**FARUQI & FARUQI, LLP**                    Richard S. Wayne (0022390)
Stuart J. Guber                           William K. Flynn (0029536)
101 Greenwood Avenue, Suite 600         Thomas P. Glass (0062382)
Jenkintown, PA 19046                 STRAUSS TROY
Telephone: (215) 277-5770            The Federal Reserve Building
Facsimile:  (215) 277-5771             150 East Fourth Street
                                  Cincinnati, OH 45202-4018
                                    Telephone: (513) 621-2120
                                    Facsimile: (513) 629-9426

**FARUQI & FARUQI, LLP**
Nadeem Faruqi                         *Attorneys for Plaintiff*
Christine E. Goodrich
Nina M. Varindani
685 Third Avenue, 26th Floor
New York, New York 10017
Telephone: (212) 983-9330
Facsimile:  (212) 983-9331


12139346_1.docx


88

## RULE 23.1 VERIFICATION

I, Charles McDonald, am the named Plaintiff to this action. I am a shareholder of RPM International, Inc. (the "Company"), and have been at all times throughout the Relevant Period, and approve the filing of this Complaint. I have reviewed the allegations made in this VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT and state that the matters stated therein about which I have personal knowledge are true, and that the other matters stated therein are true and accurate to the best of my knowledge, information and belief, based in part upon the investigation conducted by counsel. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this _27_ day of April, 2017.

Charles McDonald